IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 15-cr-00395-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    ALAN ALONZO WILLIAMS,

    Defendant.

---

**INDICTMENT**
18 U.S.C. § 1344
18 U.S.C. § 2(b)

---

The Grand Jury charges that:

## Count 1

1. Between the approximate dates of November 2, 2006 and August 5, 2008, in the District of Colorado and elsewhere, the defendant, Alan Alonzo Williams, did knowingly engage in a scheme to defraud a financial institution, namely, WebBank, and to obtain funds owned by and under the custody and control of it by means of materially false and fraudulent pretenses, representations, and promises, (hereinafter referred to as "the scheme").

2.    It was part of the scheme that:

    a. The defendant desired to obtain funds for himself and Williams Vending Company, Inc. (hereinafter "WVC"). WVC was a business established in 1994 by the defendant and his parents that sold, leased, repaired, and operated vending machines.

b. The defendant, who would not qualify for the bank loans he desired by virtue of his prior felony convictions and status as a parolee, caused another individual, Ms. X, as purported 100% owner and president of WVC, to obtain several loans from WebBank to WVC.

c. In fact, the defendant controlled the finances and operations of WVC, and he and his family members were its owners. Ms. X had no true ownership interest and was never its true president. She had merely become a part-time employee of WVC in 2006.

d. Shortly after she began working at WVC, the defendant told Ms. X that he would put the business in her name for credit purposes.  To assuage any concerns she may have had about liability, he gave her a "Promissory Agreement" in which he agreed that any financial obligation due from "credit cards, credit lines, etc." would be the complete obligation of WVC and the defendant, and that she would have no financial obligation whatsoever. Knowing that Ms. X had a serious drug problem, the defendant exploited her habit by causing her to sign various documents and then providing her with cash, which she would use to get high.

e. In November 2006, the defendant caused documents to be filed with the Colorado Secretary of State which made it appear that Ms. X had a legitimate ownership interest in WVC which she had acquired by virtue of having made a significant investment in it and having managed it for many years. In fact, she had never had a managerial position at WVC, had never invested in it, and had become its "owner" in name only.

f. In January 2007, the defendant had Ms. X sign a contract to purchase a residence located at 9261 E. Jewell Circle in Denver. In March, he arranged for her to

obtain a $900,000 loan from Aurora Loan Services, LLC to buy it. To make it appear that Ms. X qualified for this loan, the defendant caused false information to be presented to Aurora Loan Services about her employment (including fraudulent W-2's and earnings statements), false information about her financial status, and false information about her intent to use the property as her primary residence. In fact, Ms. X never intended to reside at the E. Jewell Circle property, and never did.

     g. In May 2007, to make it appear that Ms. X would have control of WVC, the defendant arranged for three bank accounts to be opened in the name of WVC over which she would have sole signature authority. He nevertheless maintained control over these accounts.

     h. The defendant enlisted the aid of loan brokers to assist him in finding funding for WVC. The brokers suggested that WVC try to obtain a Small Business Administration loan from WebBank, a financial institution in Utah, the deposits of which were insured by the Federal Deposit Insurance Corporation. He told the brokers that Ms. X would be the applicant and would serve as the personal guarantor.

     i. The Small Business Administration (hereinafter "SBA") guaranteed a certain portion of qualifying loans made by banks to small businesses, provided that the participating lender certify that but for the SBA guarantee, it would not make the loan. The SBA also required, among other things, that the business use the loan proceeds for specifically approved business purposes, that the borrower have had sufficient management experience, and that the business would have sufficient cash flow to be able to repay the loan. The SBA also required that any person owning 20% or more of the business personally guarantee the loan. In addition, the SBA considered the

character of the individual signing on the loan, as shown by his or her criminal history as described in the required SBA "Statement of Personal History Form." Anyone with felony convictions would require special approval, and anyone on parole would be ineligible.

j. The brokers agreed to present the loan request to WebBank. The defendant provided them with information, both verbal and documentary, to relay to WebBank for the purpose of acquiring an $800,000 loan to WVC. Much of that information was false, as the defendant well knew. It included fraudulent W-2 Wage and Income Statements and tax returns for Ms. X. The false information he provided the brokers made it appear that Ms. X was the president and sole owner of WVC, that she had owned the business for many years, that she had many years of management experience both at WVC and elsewhere, that she currently earned and had earned a substantial salary at WVC for many years, that she supervised the financing and purchasing aspects of the business, that she had rental income, that she had substantial assets in the form of cash, securities, and personal property, and resided in a $1.1 million home at 9261 E. Jewell Circle in Denver. None of that was true.

k. The defendant also told the brokers that WVC focused on providing vending products to government offices and agencies, as Ms. X qualified as a minority business owner, and that the company therefore qualified as a minority contractor. He explained that this minority status would allow government agencies to fulfill a portion of their minority contracting requirements by awarding contracts to WVC. The brokers passed this information on to WebBank at the defendant's direction.

l. At times, the defendant provided information directly to WebBank by fax or email, rather than through his brokers. Some of the documents the defendant sent to WebBank or provided to his brokers to send to WebBank had been signed by Ms. X; others bore signatures that were copies of hers or only purported to be hers.

m. The defendant also represented to the brokers and WebBank that the loan proceeds would be used for the following purposes: (1) $377,100 would be used to purchase vending machines to enable WVC to perform on its government contracts, (2) $372,275.24 would be used to repay existing specific debts, and (3) $50,624.76 would be used as working capital. In support of this, the defendant provided a document which purported to be a vending agreement between WVC and Peterson Air Force Base, as well as a document which purported to be a purchase order to WVC in the amount of $377,100 from Ross Vending. In fact, Peterson Air Force Base had entered no such agreement with WVC, and Ross Vending had neither sold nor agreed to sell $377,100 worth of vending machines to WVC. The documents were fraudulent.

n. The defendant caused Ms. X to sign the promissory note. She was the personal guarantor, and her name appeared on the SBA "Statement of Personal History." WebBank approved the loan on December 28, 2007 and funded it by issuing ten checks on the same day and one on January 31, 2008. In order to assure that he would have control over the proceeds, the defendant directed WebBank to include Williams Vending Company, (and not just its creditors), as a payee on the disbursement checks, "to make sure all aspects are done correctly." The bank complied. The defendant, without obtaining co-endorsements from the joint payees, caused all of the funds to be deposited into the WVC accounts. The defendant used a large portion of the proceeds

for his own purposes, rather than for the purposes authorized for the SBA-guaranteed loan.

    o. In April 2008, the defendant approached WebBank directly to request another loan for WVC. He had caused loan payments to be made by WVC in the interim. He represented that since WVC had just completed contracts to become vendor for three major apartment complexes, it would need to purchase additional vending machines and trucks. As with the first loan from WebBank, Ms. X, as "owner" of the business, would be the applicant and guarantor, and the loan would be SBA-guaranteed. In support of his request, the defendant provided a document that purported to be a vending agreement between WVC and Carmel Property Management and a document which purported to be a purchase order from Ross Vending for $339,200.00. In fact, Carmel Property Management had never contracted with WVC, and Ross Vending had neither sold nor agreed to sell WVC $339,200.00 worth of machines. The documents were fraudulent. As with the first loan, the defendant caused Ms. X's signature or purported signature to appear on the loan documents, and the SBA Statement of Personal History related to Ms. X, not to the defendant. In considering whether to grant the second loan, the bank already had a significant amount of information about WVC and Ms. X, which had been previously provided by the defendant or at his direction. WebBank approved a loan for $300,000 and funded it by wiring the proceeds, $291,742.00, to a WVC account on May 9, 2008. Instead of using the loan proceeds for the purposes authorized for the SBA-guaranteed loan, the defendant used most, if not all of it for other purposes, including the purchase of two new Mercedes Benz automobiles, one for himself and one for his daughter.

p. Shortly after the $300,000 loan was funded, the defendant approached WebBank again for additional funding for WVC. On June 10, 2008, WebBank granted the defendant's request to lend an additional $60,000 to WVC. It did so by modifying the May 9 SBA-guaranteed loan. As with the previous WebBank loans, the defendant caused the loan to be issued to WVC based on Ms. X's purported position as president and owner and her personal guarantee. As he had done previously, he again caused documents bearing or purporting to bear Ms. X's signature to be delivered to the bank. He represented that the funds were needed to purchase vehicles to transport inventory to support the company's new vending machines.  In support of that, the defendant submitted invoices from Specialty Trux.  The bank funded the loan by issuing a check in the amount of $58,650.00 payable to WVC and Specialty Trux on June 16, 2008. The defendant endorsed the check for both payees and deposited it to a WVC account, but failed to use the loan proceeds to pay the Specialty Trux invoices, as he had represented.

q. Shortly after WebBank had funded the $60,000 to WVC, the defendant attempted to obtain an additional loan from WebBank to WVC, still falsely representing that Ms. X was the president and 100% owner, and again offering her as personal guarantor. He originally requested $603,600, but later reduced that to $550,000. He falsely represented to WebBank that the funds were needed to purchase equipment for a contract WVC had entered with the City and County of Denver to be the exclusive provider of vending equipment, merchandise, and related services to the Denver Public Schools. In fact, Denver Public Schools had no such agreement with WVC. The defendant also caused a fraudulent document which purported to be a Citicorp

7

Investment Services Statement on Ms. X's account to be sent to the bank. It falsely represented that her account value was over $317,000. Further, in order to make it appear that WVC's liabilities had decreased significantly, the defendant falsely represented that the company had reduced its debt to Ms. X from $632,888 to $199,200, and produced a promissory to Ms. X in the amount of $199,200.42 to prove it. In fact, Ms. X had never loaned any money to or invested in the company, and the defendant did not intend to pay her $199,200.42 as represented.

    r. On or about August 5, 2008, WebBank denied the requested $550,000 loan.

  3. On or about December 28, 2007 and January 31, 2008, the defendant, Alan Alonzo Williams, did knowingly execute and attempt to execute the scheme described in Paragraphs 1 and 2 of this indictment by causing WebBank to fund a loan in the amount of $800,000 to Williams Vending Company, Inc., all in violation of Title 18, United States Code, Sections 1344 and 2(b).

## Count 2

  4. The allegations set forth in Paragraphs 1 and 2 of this indictment are re-alleged and incorporated by reference here, as though set forth in their entirety.

  5. On or about May 9, 2008, the defendant, Alan Alonzo Williams, did knowingly execute and attempt to execute the scheme described in Paragraphs 1 and 2 of this indictment by causing WebBank to fund a loan in the amount of $300,000 loan to Williams Vending Company, Inc., all in violation of Title 18, United States Code, Sections 1344 and 2(b).

## Count 3

6. The allegations set forth in Paragraphs 1 and 2 of this indictment are re-alleged and incorporated by reference here, as though set forth in their entirety.

7. On or about June 16, 2008, the defendant, Alan Alonzo Williams, did knowingly execute and attempt to execute the scheme described in Paragraphs 1 and 2 of this indictment by causing WebBank to approve and fund a $60,000 modification to the May 9, 2008 loan to Williams Vending Company, Inc., all in violation of Title 18, United States Code, Sections 1344 and 2(b).

## Count 4

8. The allegations set forth in Paragraphs 1 and 2 of this indictment are re-alleged and incorporated by reference here, as though set forth in their entirety.

9. Between about June 26, 2008 and August 5, 2008, the defendant, Alan Alonzo Williams, did knowingly attempt to execute the scheme described in Paragraphs 1 and 2 of this indictment by attempting to cause WebBank to fund a loan in the amount of $550,000 to Williams Vending Company, Inc., all in violation of Title 18, United States Code, Sections 1344 and 2(b).

A TRUE BILL

Ink signature on file in Clerk's Office
FOREPERSON

JOHN F. WALSH
UNITED STATES ATTORNEY

By:  s/Linda Kaufman
Linda Kaufman
Assistant United States Attorney
1225 17th Street, Suite 700

Denver, Colorado 80202
Telephone: 303-454-0100
Facsimile: 303-454-0402
E-mail: linda.kaufman@usdoj.gov
Attorney for the United States

10/6/15