IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 15-cr-00395-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   **ALAN ALONZO WILLIAMS**,

    Defendant.

## PLEA AGREEMENT

The United States of America (the government), by and through Linda Kaufman, Assistant United States Attorney for the District of Colorado, and Defendant Alan Alonzo Williams, personally and by counsel Michael J. Gallagher, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I. AGREEMENT

1. The defendant agrees to plead guilty to Count 1 of the Indictment, charging a violation of 18 U.S.C. § 1344 and 2(b), Bank Fraud.

2. The government agrees to dismiss all remaining Counts at the time of sentencing, and to not pursue further criminal charges against the defendant based on information known to the United States Attorney's Office for the District of Colorado at the time of the entry of the plea.

3. The government also agrees to recommend a sentence within the applicable guideline range as determined by the Court, excluding any downward departure.

Court's Exhibit 1

4. The parties agree that the Mandatory Victim Restitution Act applies, and that the amount of restitution in this case is $1,146,828.28.

5. The defendant is aware that 18 U.S.C. §3742 affords him the right to appeal his sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets ANY of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statutes of conviction; (2) the sentence exceeds the maximum sentence within the advisory guideline range that applies to a total offense level of 20; or (3) the government appeals the sentence imposed. If any of these three criteria applies, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

6. The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

## II.  ELEMENTS OF THE OFFENSES

The parties agree that the elements of the offense to which this plea is being tendered are as follows:

### Bank Fraud (18 U.S.C. § 1344 and 2(b))

(1) The defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution or to obtain money or property from the financial institution by means of false or fraudulent pretenses, representations, or promises;
(2) The financial institution was an institution the deposits of which were insured by the FDIC;
(3) The defendant acted with the intent to defraud;
(4) The false or fraudulent pretenses, representations, or promises the defendant made or willfully caused another to make were material, meaning that they would naturally tend to influence, or were capable of influencing the decision of the financial institution.

## III.  STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 1344 is:  not more than 360 months of imprisonment; a fine of not more than $1,000,000 or the greater of twice the gross gain or twice the gross loss from the offense, or both a fine and imprisonment; not more than 5 years of supervised release; a $100 special assessment fee; plus restitution.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.  COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the

3

rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.  STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is May 2006. The parties agree that the government's evidence would show the following:

a. The defendant desired to obtain funds for himself and Williams Vending Company, Inc. (hereinafter "WVC"). WVC was a business established in 1994 by the defendant and his parents that sold, leased, repaired, and operated vending machines.

b. The defendant, who would not qualify for the bank loans he desired by virtue of his prior felony convictions and status as a parolee, caused another individual, Ms. X,

as purported 100% owner and president of WVC, to obtain several loans from WebBank to WVC.

c. In fact, the defendant controlled the finances and operations of WVC, and he and his family members were its owners. Ms. X had no true ownership interest and was never its true president. She had merely become a part-time employee of WVC in 2006.

d. Shortly after she began working at WVC, the defendant told Ms. X that he would put the business in her name for credit purposes. To assuage any concerns she may have had about liability, he gave her a "Promissory Agreement" in which he agreed that any financial obligation due from "credit cards, credit lines, etc." would be the complete obligation of WVC and the defendant, and that she would have no financial obligation whatsoever. Knowing that Ms. X had a serious drug problem, the defendant exploited her habit by causing her to sign various documents and then providing her with cash, which she would use to get high.

e. In November 2006, the defendant caused documents to be filed with the Colorado Secretary of State which made it appear that Ms. X had a legitimate ownership interest in WVC which she had acquired by virtue of having made a significant investment in it and having managed it for many years. In fact, she had never had a managerial position at WVC, had never invested in it, and had become its "owner" in name only.

f. In January 2007, the defendant had Ms. X sign a contract to purchase a residence located at 9261 E. Jewell Circle in Denver. In March, he arranged for her to

obtain a $900,000 loan from Aurora Loan Services, LLC to buy it. To make it appear that Ms. X qualified for this loan, the defendant caused false information to be presented to Aurora Loan Services about her employment (including fraudulent W-2's and earnings statements), false information about her financial status, and false information about her intent to use the property as her primary residence. In fact, Ms. X never intended to reside at the E. Jewell Circle property, and never did.

g. In May 2007, to make it appear that Ms. X would have control of WVC, the defendant arranged for three bank accounts to be opened in the name of WVC over which she would have sole signature authority. He nevertheless maintained control over these accounts.

h. The defendant enlisted the aid of loan brokers to assist him in finding funding for WVC. The brokers suggested that WVC try to obtain a Small Business Administration loan from WebBank, a financial institution in Utah, the deposits of which were insured by the Federal Deposit Insurance Corporation. He told the brokers that Ms. X would be the applicant and would serve as the personal guarantor.

i. The Small Business Administration (hereinafter "SBA") guaranteed a certain portion of qualifying loans made by banks to small businesses, provided that the participating lender certify that but for the SBA guarantee, it would not make the loan. The SBA also required, among other things, that the business use the loan proceeds for specifically approved business purposes, that the borrower have had sufficient management experience, and that the business would have sufficient cash flow to be

able to repay the loan. The SBA also required that any person owning 20% or more of the business personally guarantee the loan. In addition, the SBA considered the character of the individual signing on the loan, as shown by his or her criminal history as described in the required SBA "Statement of Personal History Form." Anyone with felony convictions would require special approval, and anyone on parole would be ineligible.

j. The brokers agreed to present the loan request to WebBank. The defendant provided them with information, both verbal and documentary, to relay to WebBank for the purpose of acquiring an $800,000 loan to WVC. Much of that information was false, as the defendant well knew. It included fraudulent W-2 Wage and Income Statements and tax returns for Ms. X. The false information he provided the brokers made it appear that Ms. X was the president and sole owner of WVC, that she had owned the business for many years, that she had many years of management experience both at WVC and elsewhere, that she currently earned and had earned a substantial salary at WVC for many years, that she supervised the financing and purchasing aspects of the business, that she had rental income, that she had substantial assets in the form of cash, securities, and personal property, and resided in a $1.1 million home at 9261 E. Jewell Circle in Denver. None of that was true.

k. The defendant also told the brokers that WVC focused on providing vending products to government offices and agencies, as Ms. X qualified as a minority business owner, and that the company therefore qualified as a minority contractor. He explained

that this minority status would allow government agencies to fulfill a portion of their minority contracting requirements by awarding contracts to WVC. The brokers passed this information on to WebBank at the defendant's direction.

l. At times, the defendant provided information directly to WebBank by fax or email, rather than through his brokers. Some of the documents the defendant sent to WebBank or provided to his brokers to send to WebBank had been signed by Ms. X; others bore signatures that were copies of hers or only purported to be hers.

m. The defendant also represented to the brokers and WebBank that the loan proceeds would be used for the following purposes: (1) $377,100 would be used to purchase vending machines to enable WVC to perform on its government contracts, (2) $372,275.24 would be used to repay existing specific debts, and (3) $50,624.76 would be used as working capital. In support of this, the defendant provided a document which purported to be a vending agreement between WVC and Peterson Air Force Base, as well as a document which purported to be a purchase order to WVC in the amount of $377,100 from Ross Vending. In fact, Peterson Air Force Base had entered no such agreement with WVC, and Ross Vending had neither sold nor agreed to sell $377,100 worth of vending machines to WVC. The documents were fraudulent.

n. The defendant caused Ms. X to sign the promissory note. She was the personal guarantor, and her name appeared on the SBA "Statement of Personal History." WebBank approved the loan on December 28, 2007 and funded it by issuing ten checks on the same day and one on January 31, 2008. In order to assure that he

would have control over the proceeds, the defendant directed WebBank to include Williams Vending Company, (and not just its creditors), as a payee on the disbursement checks, "to make sure all aspects are done correctly." The bank complied, and WebBank issued checks in the following amounts payable jointly to Williams Vending Company, Inc. and a named creditor of Williams Vending:

```
       $ 337,100.00
          44,074.67
          22,523.00
          51,579.80
          37,273.60
          47,107.47
          40,000.00
          67,695.83
          33,967.80
          32,279.76
          68,253.07
Total: $ 781,855.00
```

Each of the checks was endorsed in the name of Williams Vending Company and the named co-payee, but none of the co-payees actually endorsed its check, as intended by the bank. Instead, the defendant caused all of the fraudulently endorsed checks to be deposited into a Williams Vending Company bank account, and Williams Vending received full credit in the amount of the checks. Although the defendant did make payments to some of the co-payee creditors, he did not turn over the full amounts of WebBank's checks to the creditors, as was required by the terms of the loan. The defendant used a large portion of the proceeds for his own purposes, rather than for the purposes authorized for the SBA-guaranteed loan.

o. In April 2008, the defendant approached WebBank directly to request another loan for WVC. He had caused loan payments to be made by WVC in the interim. He represented that since WVC had just completed contracts to become vendor for three major apartment complexes, it would need to purchase additional vending machines and trucks. As with the first loan from WebBank, Ms. X, as "owner" of the business, would be the applicant and guarantor, and the loan would be SBA-guaranteed. In support of his request, the defendant provided a document that purported to be a vending agreement between WVC and Carmel Property Management and a document which purported to be a purchase order from Ross Vending for $339,200.00. In fact, Carmel Property Management had never contracted with WVC, and Ross Vending had neither sold nor agreed to sell WVC $339,200.00 worth of machines. The documents were fraudulent. As with the first loan, the defendant caused Ms. X's signature or purported signature to appear on the loan documents, and the SBA Statement of Personal History related to Ms. X, not to the defendant. In considering whether to grant the second loan, the bank already had a significant amount of information about WVC and Ms. X, which had been previously provided by the defendant or at his direction. WebBank approved a loan for $300,000 and funded it by wiring the proceeds, $291,742.00, to a WVC account on May 9, 2008. Instead of using the loan proceeds for the purposes authorized for the SBA-guaranteed loan, the defendant used most, if not all of it for other purposes, including the purchase of two new Mercedes Benz automobiles, one for himself and one for his daughter.

p. Shortly after the $300,000 loan was funded, the defendant approached WebBank again for additional funding for WVC. On June 10, 2008, WebBank granted the defendant's request to lend an additional $60,000 to WVC. It did so by modifying the May 9 SBA-guaranteed loan. As with the previous WebBank loans, the defendant caused the loan to be issued to WVC based on Ms. X's purported position as president and owner and her personal guarantee. As he had done previously, he again caused documents bearing or purporting to bear Ms. X's signature to be delivered to the bank. He represented that the funds were needed to purchase vehicles to transport inventory to support the company's new vending machines. In support of that, the defendant submitted invoices from Specialty Trux. The bank funded the loan by issuing a check in the amount of $58,650.00 payable to WVC and Specialty Trux on June 16, 2008. The defendant endorsed the check for both payees and deposited it to a WVC account, but failed to use the loan proceeds to pay the Specialty Trux invoices, as he had represented.

q. Shortly after WebBank had funded the $60,000 to WVC, the defendant attempted to obtain an additional loan from WebBank to WVC, still falsely representing that Ms. X was the president and 100% owner, and again offering her as personal guarantor. He originally requested $603,600, but later reduced that to $550,000. He falsely represented to WebBank that the funds were needed to purchase equipment for a contract WVC had entered with the City and County of Denver to be the exclusive provider of vending equipment, merchandise, and related services to the Denver Public

Schools. In fact, Denver Public Schools had no such agreement with WVC. The defendant also caused a fraudulent document which purported to be a Citicorp Investment Services Statement on Ms. X's account to be sent to the bank. It falsely represented that her account value was over $317,000. Further, in order to make it appear that WVC's liabilities had decreased significantly, the defendant falsely represented that the company had reduced its debt to Ms. X from $632,888 to $199,200, and produced a promissory to Ms. X in the amount of $199,200.42 to prove it. In fact, Ms. X had never loaned any money to or invested in the company, and the defendant did not intend to pay her $199,200.42 as represented.

r. On or about August 5, 2008, WebBank denied the requested $550,000 loan, and suffered no actual loss as a result. The parties agree that as to this attempt, the Court must determine what the "intended loss" was, i.e., the pecuniary harm that the defendant purposely sought to inflict, in applying U.S.S.G. § 2B1.1(b)(1). They disagree on what that amount is.

s. The defendant's position is that the loan proceeds, while to be diverted in part, were intended in part to fund the operations of Williams Vending Company. As such, the loss Defendant "purposely sought to inflict" was not the full amount of this denied loan. United States v. Manatau, 647 F.3d 1048, 1050 (10th Cir. 2011). Though Mr. Williams intended to divert some of the $550,000 loan, the continued operation of Williams Vending Company meant that the amount of "intended loss" was not the full

amount of this proposed loan, and that the total loss is below the $1,500,000 threshold of U.S.S.G. § 2B1.1(b)(1)(I).

　　t. The government's position is that in determining, by a preponderance of the evidence, the harm that the defendant purposely sought to inflict, the Court may properly consider what loss he expected to inflict, since a person is presumed to have intended the natural and probable consequences of his actions. United States v. Manatau, 647 F.3d at 1055. The Court is free to make reasonable inferences about the defendant's mental state from the available facts. Id. at 1056. In this case, the defendant was responsible for obtaining an $800,000 loan for Williams Vending Company on December 28, 2007. The principal balance on that loan as the date the fraud was discovered in 2009 (and as of July 2016) had been reduced by $12,425.42 to $787,574.58, a reduction of approximately 1.6%. On May 9 and June 10, 2008, the defendant caused WebBank to loan an additional $360,000 to Williams Vending Company. Similarly, the principal balance on that loan had only been reduced by $746.30 to $359,253.70, a reduction of approximately .22% as of the date the fraud was discovered (and as of July 2016). Given that the defendant's *modus operandi* in attempting to obtain the last $550,000 remained consistent, and Williams Vending did not have a contract with the City and County of Denver as represented, it is the government's position that the natural and probable consequences of the last attempt were that very little, if any, of the principal would have been repaid, and the intended loss was approximately $550,000. Even a 1% reduction to the principal would have

made the intended loss $544,500. The Court need only make a reasonable estimate of the intended loss. U.S.S.G § 2B1.1 Appl. Note 3(C); United States v. Manatau, 647 F.3d at 1056.

## VI. ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. The base guideline is §2B1.1(a)(1), with a base offense level of 7.

B. The government's position is that guidelines loss is more than $1,500,000 but less than $3,500,000, resulting in a 16-level increase pursuant to §2B1.1(I). The defendant's position is that the guidelines loss is more than $550,000 but less than $1,500,000, resulting in a 14-level increase pursuant to §2B1.1(b)(1)(H).

C. There are no victim-related, role-in-offense, obstruction, or multiple-count adjustments.

D. The adjusted offense level would therefore be 23, according to the government's calculation, or 21, according to the defendant's calculation.

14

E.   If the defendant clearly demonstrates acceptance of responsibility for his offense, the offense level should be decreased by 2 levels pursuant to §3E1.1(a). If he qualifies for a decrease under §3E1.1(a) and also timely notifies the government of his intention to enter a guilty plea, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently, the government will file a motion pursuant to §3E1.1(b) requesting that he receive a downward departure of an additional 1 level. The resulting offense level would be 20, according to the government's calculation, or 18, according to the defendant's calculation.

F.   The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be V.

G.   The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.   The advisory guideline range resulting from these calculations is 63-78 months, according to the government's calculation, or 51-63 months, according to the defendant's calculation. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 27 months (offense level 18, bottom of Category I) to 87 months (offense level 20, top of Category VI). The guideline range

would not exceed, in any case, the statutory maximum applicable to the count of conviction.

I.      Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $15,000 to $150,000, plus applicable interest and penalties, according to the government's calculation, or $10,000 to $100,000 plus applicable interest and penalties, according to the defendant's calculation.

J.      Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 2 years, but not more than 5 years.

K.      The Court must enter an order of restitution for the full amount of the victim's loss, as authorized under 18 U.S.C. § 3663A. The parties agree that the amount of restitution in this case is $1,146,828.28.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

The parties are aware of no grounds for a guideline departure. However, no estimate by the parties regarding the guideline range precludes the defendant from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application for all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it

deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length and form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.  ENTIRE AGREEMENT

This document states the parties' entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: _____

_____
Alan Alonzo Williams
Defendant

Date: 1/9/17

_____
Michael J. Gallagher
Attorney for Defendant

Date: 1/12/17

_____
Linda Kaufman
Assistant U.S. Attorney

12/16/2016

17