**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 1:15-cr-00395-REB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     ALAN ALONZO WILLIAMS,

      Defendant.

---

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR
DOWNWARD DEPARTURE AND VARIANCE**

---

TO THE HONORABLE ROBERT E. BLACKBURN, SENIOR UNITED STATES DISTRICT
JUDGE FOR THE DISTRICT OF COLORADO:

In advance of his sentencing hearing scheduled for August 17, 2017, Defendant Alan
Alonzo Williams submits this Sentencing Memorandum and Motion for Downward Departure
and Variance ("Memorandum").  The positions stated here are supported by the facts and
circumstances described in Defendant's Response to the Presentence Report (Docket No. 55),
which is incorporated by reference.

The United States Probation Office ("Probation") recommends a sentence of 87 months,
which is the maximum guideline sentence applicable to an offense level of 20 and a criminal
history category VI.  For the reasons described in this Memorandum, Mr. Williams proposes a
sentence of no more than 57 months, which is the bottom of the guidelines for an offense level of
18 and assuming (without accepting) that Probation has properly placed Mr. Williams in criminal
history category VI.  This recommendation is made because (i) Probation's recommendation

assumes too high of a guideline loss enhancement; and (ii) the offense is mitigated by the fact that Mr. Williams was motivated to save a struggling family business and not just engaged in a theft of all loan proceeds.

### Background and Summary of Sentencing Position

Raised by hard-working parents who provided for him and his two siblings, Mr. Williams' early life revolved around his father, a career U.S. Army officer, who was frequently relocated to duty stations throughout the United States and, for a time, to Germany.  After retiring from the Army in 1979, Colonel Alonzo Williams, Jr. (ret.) moved his family to Colorado.  In 1981, Mr. Williams graduated from Aurora Central High School, and left home on a college basketball scholarship.  After he returned to Colorado, and decades before the offenses charged here, he began work for his father at Williams Vending Company, the family business involved in this case.

Mr. Williams made misrepresentations to obtain the loans at issue here, and his guilty plea accepts responsibility for this misconduct.  But these offenses are mitigated by facts showing that rather than simply absconding with loan proceeds, Mr. Williams used the bulk of loan proceeds for legitimate business purposes in a real effort to save his family's business.  The bulk of the loss in this case resulted from the failure of Williams Vending, not simple theft of loan proceeds.

Mr. Williams explains, as reported at paragraphs 44 and 45 of the Presentence Investigation Report ("PSR"), that after his father's death he was desperate to make Williams Vending a success, and acknowledges that he "took the easy road" by obtaining these loans fraudulently and misusing some of these funds.  But he also explains that he was substantially

motivated by a desire to make his family business a success.  His mother confirms these circumstances at paragraph 93 of the PSR.

The government and Probation conclude that the total offense level is 20, and on that basis and an assumed criminal history category of VI, Probation recommends a maximum guideline sentence of 87 months.  This offense level calculation, and Probation's harsh sentencing recommendation, are based on the unsupported assumption that Mr. Williams intended to cause harm in the full amount of all loan proceeds, including the proceeds of a loan he sought but did not receive.  But the evidence shows something very different.  Very substantial portions of loan proceeds were used to fund and operate Williams Vending.  Hundreds of thousands of dollars were used to pay Williams Vending's creditors as loan proceeds became available.  Under these circumstances, it is wrong to conclude that Mr. Williams intended a harm equal to all proceeds of a loan sought but denied.  The proper offense level is 18, not 20.

Mr. Williams asks the Court to find that the proper offense level is 18, and proposes that he be sentenced to no more than 57 months, which is the bottom of the guideline range based on that offense level and an assumed criminal history category VI.  If necessary to support this sentence, Mr. Williams asks for a downward departure to this guideline range, or a variance outside of the calculated guidelines.  Particularly given his age and the nature of this offense, this sentence meets the sentencing requirements of 18 U.S.C. § 3553(a).

**THE LOSS AMOUNT CALCULATED BY PROBATION AND THE GOVERNMENT IS OVERSTATED**

Pursuant to U.S.S.G. § 2B1.1, Probation applies a 16-level enhancement for a loss amount exceeding $1,500,000 (but less than $3,500,000), resulting in a total offense level of 20. As discussed in his objections to the PSR, Probation would hold Mr. Williams responsible for $1.1M in actual losses, and an additional $550,000 in intended losses based upon a third loan that was never funded, resulting in a calculated guideline loss amount of $1,696,828.28.

Relying on the remaining balances on the two funded loans, the government argues – and Probation accepts - that even though the $550,000 loan was not funded (and there was no actual loss), Mr. Williams intended a loss in the entire amount of that unfunded loan.  This argument ignores that hundreds of thousands of dollars of loan proceeds were paid to creditors and used to operate Williams Vending Company.  Mr. Williams' use of loan proceeds from funded loans shows he did not intend to cause a loss in the full amount of the unfunded loan.  Mr. Williams' objection to the PSR's calculation of guideline loss should be sustained, and his sentence based on the 14-level enhancement of U.S.S.G. § 2B1.1(b)(1)(H), not the 16-level enhancement of § 2B1.1(b)(1)(I) applied in the PSR.

**The Loan Funded December 28, 2007 Was Used Largely to Operate Williams Vending**

On December 28, 2007, WebBank issued ten checks, each in the name of a creditor and, at Mr. Williams' request, Williams Vending Company.  These checks funded loan #501000060 in the amount of $787,000 and, after loan origination and other fees, included:

| Intended Recipient | Loan Amount | Purpose | Reference | Amount Paid to Creditor |
|---|---|---|---|---|
| Pinnacle Business Finance | $67,695.83 | Debt payoff. | WF_00000543[1] GJ_00000420 | Paid via liquidation. |
| Pinnacle Business Finance | $68,253.07 | Debt payoff. | WF_00000527 GJ_00000441 | Paid via liquidation. |
| Pentech Financial Service | $51,379.80 | Debt payoff. | WB_00004005 | $42,000 (1/11/08) INT_00000004 |
| Net Bank Business Finance | $44,074.67 | Debt payoff. | JPM_00000222 | $42,869.54 (Jan. 2008) INT_00000154 |
| Financial Pacific Leasing | $22,523.00 | Debt payoff. | JPM_00000225 | Awaiting supporting documentation from creditor. |
| Martin Leasing Corp. | $47,107.47 | Debt payoff. | JPM_00000220 | No additional information available. |
| First Federal Leasing | $33,967.80 | Debt payoff. | JPM_00000226 | Paid; see below. |
| Puget Sound Leasing | $37,273.60 | Debt payoff. | JPM_00000223 | $31,500 (Jan. 2008) INT_00000019 |
| Ross Vending | $337,100.00 | Equipment purchase. | WB_00002662 | INT_00000116; INT_00000039; Paid in full as described below. |
| Ross Vending (Issued January 31, 2008) | $40,000 | Equipment purchase. | WF_00000548 | Paid for inventory purchased; see below. |
| Williams Vending Co. | $32,279.76 | Working capital. | WF_00000525 | Properly spent. |
| **TOTAL** | $781,655.00 | | | |

---

[1] Most documents cited in this Memorandum are found in the discovery provided by the government.  These documents are voluminous and will not be provided to the Court prior to sentencing; paper copies, however, will be offered at sentencing.  All other materials are attached.

Mr. Williams admits that he, "without obtaining co-endorsements from the joint payees, caused all of the funds to be deposited into the WVC accounts" and that he "used a large portion of the proceeds for his own purposes, rather than for the purposes authorized for the SBA-guaranteed loan." The government alleges, and Mr. Williams acknowledges, that he improperly purchased two Mercedes vehicles with loan proceeds from Murray Motors in the amount of approximately $85,000. (See, e.g., MMI_00000004-05). But the evidence doesn't support the government's claim that Mr. Williams intended to divert essentially all loan proceeds for personal use, or that he intended to cause a loss in the full amount of the loan he sought but did not receive. The government's own investigation shows that Mr. Williams used very substantial portions of loan proceeds to pay off creditors of Williams Vending and otherwise to support that business. Since Probation relies on the government's discovery materials to support its conclusion, Mr. Williams relies principally on discovery materials in opposition to Probation's recommendations.

## I.      The Government's Investigation

After receiving the WebBank checks and improperly depositing them into accounts he controlled, Mr. Williams negotiated lower payoff amounts with creditors of Williams Vending Company and made payments to resolve those obligations. This fact is confirmed by the government's own investigation.

### 1.      Pentech Financial Advisors

On January 11, 2008, via cashier's check #0548403594 (see WB_00004005), Mr. Williams paid Pentech Financial Advisors $42,000, settling Williams Vending's $51,379.80

debt for which loan proceeds were funded.  This pay off was confirmed by the government's interview of Mr. Robert Amos, General Counsel for Pentech Financial.  (See INT_00000004).

### 2.      Puget Sound Leasing

Mr. Williams paid Puget Sound Leasing $31,500, settling Williams Vending's $37,273.60 debt for which loan proceeds were funded.  This pay off was confirmed by the government's interview of a representative from First Sound Bank, Puget Sound Leasing's successor in interest.  (See INT_00000019).

### 3.      NetBank Business Finance

Mr. Williams paid NetBank Business Finance $42,869.54, settling Williams Vending's $44,074.67 debt for which loan proceeds were funded.  This pay off was confirmed during the government's interview of a representative of Leaf Funding, LLC, a successor to NetBank.  (See INT_00000154).

These payoffs to creditors of Williams Vending do not excuse the fraud that was perpetrated upon WebBank to obtain this loan, but they show that Mr. Williams did not intend the entire unfunded loan ($550,000) to be diverted, or to cause a loss to WebBank in the full amount of any of these loans.

### 4.      Interviews of Ross Vending

Although the government's investigation did not confirm that Ross Vending Company was paid in full, further inquiry shows that this occurred.

Mr. Ross Goldstein of Ross Vending Company was interviewed by the Federal Bureau of Investigation ("FBI") on August 24, 2012.  (*See* INT_00000039-40).  Mr. Goldstein stated that he sold "three to four truckloads of refurbished vending machines which consisted of

approximately 90 to 120 machines" to Alan Williams and Williams Vending Company "for 800 to 900" per machine.  (*Id*. at 39.)  He was not asked whether Mr. Williams paid Ross Vending for these machines with loan proceeds.

On July 12, 2017, counsel for Mr. Williams spoke via telephone with Mr. Ross Goldstein.  Mr. Goldstein confirmed his prior statements to the FBI that he had sold machines to Williams Vending Company, and stated that Williams Vending had paid in full and did not owe Ross Vending any money he knew of.  Mr. Goldstein did not believe that he had maintained any records of the transactions, but added that the amounts the FBI told him Williams Vending claimed to have purchased were exaggerated.

Mr. Williams inflated the invoices provided to WebBank concerning his purchase of equipment for Williams Vending from Ross Vending.  But Williams Vending did make a substantial purchase of refurbished machines from Ross Vending with loan proceeds.  Using Mr. Goldstein's recollections, which as described below is not fully supported by other evidence in the discovery record, Williams Vending purchased at least 90 machines from Ross Vending at a cost of no less than $800 per machine, amounting to a conservative estimate of $72,000 in legitimate purchases.  If Williams Vending purchased 120 machines at $900 per machine, however, Williams would have paid Ross Vending $108,000.  Again, the evidence shows that substantial loan proceeds were used to pay Williams Vending's creditors to support that business.

Mr. Goldstein has acknowledged in the discovery record that he lacks records to show how many machines he sold to Williams Vending or the payments he received.  He also acknowledges receiving cash payments.  (See WB_00002268 at deposition p. 31, line 12-15.)

Substantial payments made to Ross Vending are confirmed by the discovery record.  The record contains at least one check in the amount of $33,000 (see WF_00000791) paid to Ross Vending for delivered machines.  In addition, the government's interview with Mr. Williams' loan broker, Jim Moldane, reveals that Mr. Williams told him he paid Ross Vending an additional $200,000 dollars in cash for machines during a visit to Mr. Goldstein in California.  (See INT_00000116.) These transactions are further supported by bank records showing payments for freight charges for machine transportation.  (See WF_0000579, showing a freight payment of $2,475.61; and WF_0000589, showing a freight payment of $3,363.56.)

> ### 5.       "Working Capital"

As part of this initial loan, Williams Vending received $32,279.76 for "working capital." The record shows that Mr. Williams spent substantially more than this amount to pay the company's on-going expenses.  In early January, after the loans were funded and deposited by Williams, cashier's checks were cut to pay for inventory (7 Up, $18,000), rent (Michael Bloom Realty, $23,000), and consulting services – Mr. Jim Moldane, an advisor who helped Williams apply for the SBA-back loans, received a commission from Williams Vending Company.  (See, e.g., INT_00000116.)  Additional company expenses paid with loan proceeds included, for example, loan payments (WF_00000736-737) and origination costs paid to HFC/Beneficial (WF_00000783), additional products (WF_00000787), and running costs such as employee compensation and service vehicle maintenance and repair.  These additional expenses amount to tens of thousands of dollars, more than this "working capital" amount.

6.      **Additional Investigation**

Although a review of the government's evidence brings Mr. Williams' intended loss below the $1,500,000 threshold for a 16-level enhancement under §2B1.1, additional investigation establishes that even more loan proceeds were used for legitimate business purposes, reducing the provable intended loss.  Despite the passing of time and transferring of interests, two additional creditors of Williams Vending Company spoke with counsel and each of them confirmed receipt of payments from Williams Vending Company immediately after the loans were funded.[2]

a.  **First Federal Leasing**

On July 13, 2017, First Federal Leasing – a creditor of $33,967.80 – provided documentation that Williams Vending Company settled its debt with First Federal Leasing.  (See attached Exhibit A.)  Via Bank of the West check #6751, on or about February 17, 2008, Williams Vending Company paid First Federal Leasing $30,000.  To reflect this settlement, First Federal Leasing completed a 1099-C form cancelling the remaining $3,967.80 debt.  (See also BOW_00000027, discovery records produced by Bank of the West.)

b.  **Financial Pacific Leasing**

During a July 5, 2017 telephone call with Financial Pacific Leasing – a creditor of $22,523.00 – counsel learned that Williams Vending Company's account was closed in 2008.

---

[2] At least one creditor agreed to provide supporting documentation only after receipt of a notarized release.  Counsel attempted to visit Mr. Williams with a notary present on June 23, 2017, and was told that special permission must be sought for a non-lawyer to visit.  When such permission had not yet been granted, on July 28, 2017 counsel arranged for an attorney-notary to obtain these releases.  Due to this delay, these supporting documents are not yet available, but will be submitted when received at or before the sentencing hearing.

Financial Pacific Leasing has been provided with the written authorization they requested to produce records from Williams Vending's account, but as of this filing such records have not been received.  If they are produced, these records will be submitted to the Court at sentencing.

| Intended Recipient | Loan Amount | Purpose | Amount Paid to Creditor |
|---|---|---|---|
| First Federal Leasing | $33,967.80 | Debt payoff. | $30,000; *See* Exhibit A. |
| Financial Pacific Leasing | $22,523.00 | Debt payoff. | Awaiting documentation from creditor. |
| **ADDITIONAL AMOUNTS PAID** | | | **TBD** |

In summary, hundreds of thousands of dollars from this initial loan were used to support the family business rather than being diverted for personal use by Mr. Williams.

| Intended Recipient | Loan Amount | Purpose | Amount Paid to Creditor |
|---|---|---|---|
| Pentech Financial Service | $51,379.80 | Debt payoff. | Settled for payment of $42,000; *See* INT_00000004 |
| Net Bank Business Finance | $44,074.67 | Debt payoff. | Settled for payment of $42,869.54; *See* INT_00000154. |
| Puget Sound Leasing | $37,273.60 | Debt payoff. | Settled for payment of $31,500; *See* INT_00000019. |
| Ross Vending | $337,100.00 | Equipment purchase. | Estimate of Amount Paid: $290,000. |
| Ross Vending | $40,000 | Equipment purchase. | See above. |
| Williams Vending Co. | $32,279.76 | Working capital. | Properly spent at least this amount. |
| **EST. TOTAL PAID** | | | **$406,369.54** |

The available evidence establishes *that over $400,000 of the $787,000 loan was used for intended purposes*, either to pay off creditors, purchase equipment, as working capital for Williams Vending Company, or to pay the broker who arranged this loan.  A full accounting of funds used for business purposes is not available as the discovery records shows that many cash payments were made.  It is clear, however, that hundreds of thousands of dollars of loan

proceeds were used in an effort to support Mr. Williams' family business. As such, the government cannot prove by a preponderance of the evidence that Mr. Williams intended the full amount of the unfunded $550,000 loan to be lost.

**Proceeds from the $300,000 + $60,000 Loans Funded in May/June 2008**

Besides the $787,000 loan funded in January 2008, WebBank funded a second loan to Williams Vending Company later that year. In May, the loan provided Williams Vending Company with approximately $300,000 (minus related costs and fees), and in June 2008 a second check was issued by WebBank (to both Specialty Trux, LLC and Williams Vending Company) for $58,650 on the $60,000 loan. (See WF_0000565.) These funds were provided to purchase additional equipment and operating capital for Williams Vending Company. The great bulk of these loan proceeds were used to operate Williams Vending.

I.     **The Government's Investigation**

   a.   **The $300,00 Loan**

Mr. Williams invested most of the loan proceeds in the continued operation of Williams Vending Company. These checks provided by the government in discovery illustrate the point

| Date | Vendor | Amount | Discovery Ref. |
|---|---|---|---|
| May 12, 2008 | Michael Bloom Realty ("May Rent") | $3,200.00 | WF_00000801 |
| May 12, 2008 | HFC ("Payoff Acct") | $13,997.82 | WF_00000786 |
| May 28, 2008 | Coca-Cola ("Beverages") | $5,406.96 | WF_00000747 |
| May 28, 2018 | Coca-Cola ("Beverages") | $9,812.40 | WF_00000748 |
| May 28, 2008 | Murray Motors ("Service...") | $4,303.47 | WF_00000738 |
| May 29, 2008 | Seven Up ("Beverages") | $15,379.50 | WF_00000780 |
| July 1, 2008 | Ross Vending | $33,000.00 | WF_00000791 |

| July 9, 2008 | Jim Moldane ("Services") | $15,640.00 | WF_00000730 |
| July 10, 2008 | Vendors Exchange ("Beverage machines 16 complete units") | $8,000.00 | WF_00000794 |
| July 10, 2008 | Michael Bloom Realty | $3,200.00 | WF_00000729 |
| July 11, 2008 | Chase Automotive Repair | $2,226.24 | WF_00000803 |
| July 31, 2008 | Michael Bloom Realty | $6,000.00 | WF_00000721 |
| August 6, 2008 | Coca-Cola ("Beverages") | $13,888.32 | WF_00000753 |
| August 6, 2008 | Coca-Cola ("Beverages") | $6,385.20 | WF_00000752 |
| October 20, 2008 | Gateway Industrial ("Lease Deposit") | $11,716.66 | WF_00000792 |
| October 29, 2008 | Seven Up | $25,650.00 | WF_00000802 |
| | **TOTAL** | $177,806.57 | |

Again, because many company expenses were paid in cash transactions, a to-the-dollar accounting of loan proceeds used for legitimate business purposes is not available, but even the available discovery record shows that most of these loan proceeds were properly used.

**b.      The $60,000 Loan**

As to the Specialty Trux obligation, Mr. Williams deposited the loan proceeds of $58,650 directly into a Williams Vending account (*see* WF_0000564). But Mr. Williams subsequently made three significant payments to Specialty Trux, a service vehicle modification business catering to the vending and snack food industry, totaling $51,515.00. After payment of loan origination and related expenses, nearly all of the proceeds of this loan was used for its intended purpose.

| Date | Vendor | Amount | Discovery Ref. |
|------|--------|--------|----------------|
| June 18, 2008 | Specialty Trux, LLC | $20,000.00 | WF_0000539 |
| July 15, 2008 | Specialty Trux, LLC ("2006 Isuzu Truck Deposit") | $8,000.00 | WF_00000784 |
| Sept. 10, 2008 | Specialty Trux, LLC ("2005 Isuzu NPR Vehicle") | $23,515.00 | WF_00000788 |
| | **TOTAL** | $51,515.00 | |

## II.      Calculations

The available evidence shows that Mr. Williams used most of these loan proceeds, totaling hundreds of thousands of dollars, to support his family's business; it cannot be established by a preponderance of the evidence, as the government and Probation claim, that Williams intended to cause a loss in the full amount ($550,000) of the loan he sought but did not receive.  Presumably, these funds would also have been used in substantial part to support the legitimate business of Williams Vending.  But even if it is assumed that the same portion of the unfunded $550,000 loan would be used for non-business purposes, Mr. Williams' intended loss amount is *dramatically below* U.S.S.G. § 2B1.1(b)(1)(I)'s $1,500,000 floor supporting a 16-level enhancement, and a 14-level enhancement should be applied instead.

### CONCLUSIONS ON GUIDELINE LOSS AND ALTERNATIVE REQUEST FOR DOWNWARD DEPARTURE

Mr. Williams has demonstrated by a preponderance of the evidence that the intended loss amount does not exceed $1,500,000.  *See U.S. v. Washington*, 11 F.3d 1510 (10th Cir. 1993), *citing McMillan v. Pennsylvania*, 477 U.S. 79, 91082 (1986) (holding that due process does not require that sentencing factors be proved by more than a preponderance of the evidence)*; and* U.S.S.G. § 6A1.3, comment.  Mr. Williams' objection to the total offense level based upon the § 2B1.1 loss guideline should be sustained.  Mr. Williams' total offense level should be enhanced 14 levels, not 16 as previously calculated, resulting in a total offense level of 18.

Even if the Court discounts this evidence, overrules his objection, and finds that the total offense level should be calculated based upon a guideline loss amount exceeding $1,500,000, the loss amount determined by Probation falls just inside the bottom end amount meriting a 16-level enhancement.  *See* U.S.S.G. §2B1.1(b)(1)(I).  Application Note 20(C) to § 2B1.1 states that:

14

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted.

U.S.S.G. §2B1.1 at n. 20(C).  Here, Mr. Williams' offense is equated with that of a defendant who intended a loss of as much as $3,499,999 and personally absconded with those funds.  Here the actual loss is only $1.1 million, and the great bulks of loan proceeds were used for legitimate business purposes.  Because the guidelines overstate the seriousness of this offense, Mr. Williams should receive a two-level downward departure to an offense level of 18, even if the Court finds that the guideline loss exceeds $1,500,000.

## APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS AND A SENTENCING VARIANCE

Mr. Williams proposes a sentence of 57 months, which is the bottom of the guideline range, assuming (without accepting) an offense level of 18 and a criminal history category of VI.

### Age and Medical Condition

If the Court finds that Mr. William's guideline range was appropriately calculated by Probation, and that a downward departure is not appropriate based on Application Note 20 above, the statutory sentencing factors still favor a variance from a guideline range sentence.  *See United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007) (en banc), *overruled on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008).  Mr. Williams' advanced age and his low risk of recidivism upon release mean that a guidelines-range sentence in this case would disproportionately affect the Defendant and provide greater punishment than necessary.

Under 18 U.S.C. § 3553(a), a sentencing court must consider, among other factors,

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

    (C) to protect the public from further crimes of the defendant;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct;

18 U.S.C. § 3553(a).

Mr. Williams is a 54-year-old man detained for the past 16 months pending the resolution of this case.  During that time, Mr. Williams' health as gone from bad to worse, as a pre-existing hernia will require corrective surgical care and an arthritic knee, the result of a basketball injury during college, will need replacement.  Unlike a younger offender, Mr. Williams is not well equipped for a lengthy stay in federal prison.  And despite his criminal history, the longest actual sentence that Mr. Williams has served, to date, has been only approximately 48 months.  Mr. Williams probably will not be released from federal custody before his 60th birthday, and – given his pending state cases – his release will likely be delayed even further.

**Comment on Criminal History**

In Defendant's Response to the Presentence Report (Docket No. 55), Mr. Williams challenged a total of 5 points assigned to him by Probation in calculating a criminal history category of VI, and asked to review Probation's supporting documents.  Probation has declined to provide counsel with those documents, agreeing instead to provide those documents when Probation submits its Addendum to the PSR on or about August 8, 2017.  Mr. Williams will address Probation's response when it is available.  Until that time, Mr. Williams assumes, but does not accept, that his criminal history category is VI.

Mr. Williams acknowledges that he has a significant criminal history.  But there are, however, important mitigating facts about this criminal history.

16

First, although Mr. Williams has a significant criminal history, little of that criminal history is recent. The current offense occurred over ten years ago, and his last conviction or arrest, prior to his current incarceration, occurred five years prior to his arrest in this case in March of 2016.

Second, Mr. Williams' criminal history includes few offenses relating to personal violence, and nothing of that kind in recent years. The only related event in the past two decades is a municipal harassment charge reported at paragraph 81 of the PSR. Mr. Williams does not agree this event involved actual violence. Mr. Williams has no criminal history relating to weapons or a drug history.

Third, despite his criminal history, Mr. Williams' age makes him a lower risk of recidivism than a younger defendant. As a U.S. Bureau of Prisons report cited by then Judge Gorsuch concludes, recidivism rates are "inversely related to age at release." *United States v. Smith*, 756 F.3d 1179, 1183. This should bear upon the Court's determination of whether "still more incarceration is necessary to protect the public." *Dean v. United States*, 137 S.Ct. 1170, 1176 (2017) (citing a defendant's prospective release from incarceration after his fiftieth birthday as evidence that the public was adequately protected).

While his age and medical condition do not mitigate Mr. Williams' offense conduct, these circumstances suggest that incarceration will be a harsher punishment for Mr. Williams than for other defendants. Given his age and deteriorating health, any term of imprisonment will constitute a larger portion of his remaining natural life than that of a younger defendant.

## Sentencing Recommendation

Mr. Williams objects to the PSR's recommendation he be sentenced to 87 months, which is the top end of the guideline range calculated by Probation.

Because the guideline loss is less than $1,500,000, the proper total offense level is 18 rather than 20. Assuming a Criminal History Level VI, the proper guideline range is 57-71 months. A maximum guideline sentence would be 71 months, not the 87 months recommended by Probation. Considering all relevant factors, a sentence at the bottom of this guideline range, 57 months, will meet the requirements of 18 U.S.C. 3553.

Even if the Court finds that the proper offense level is 20, Probation's recommended sentence of 87 months substantially exceeds the sentence necessary to meet the requirements of 18 U.S.C. 3553.

The guidelines add two additional points to the offense level for a guideline loss exceeding $1,500,000 but less than $3,500,000 pursuant to § 2.B1.1(b)(1)(I). Even if the guideline loss is as Probation calculates ($1,696,828.28), this loss is at the very bottom of this category of guideline loss and does not justify a sentence at the top of the resulting guideline range.

Although Mr. Williams' offense is serious, it is mitigated by the fact that these loans were obtained in large part in a failed effort to fund a long-existing family business. This is not a more aggravated case than where loan proceeds were effectively stolen for personal use via a non-existing entity, or where the defendant concealed his identity for this purpose. Mr. Williams' involvement in the loan process was no secret. (See paragraphs 19 and 20 of the PSR.) And Mr. Williams remained active at Williams Vending and communicated with the

lender after the loans were made.  Again, a sentence at the maximum of the guideline range is not justified by these circumstances. See 18 U.S.C. 3553 (a)(1).

Mr. Williams is a 54-year old with significant health issues, and even if sentenced to 57 months, he will be approximately 60 years old when he completes this sentence and at least 65 years old when he completes supervision.  At his age, and particularly given the Supervised Release served after his incarceration, he is a modest risk to reoffend.  A sentence at the maximum of the guideline range is not justified by the risk of future offenses.  See 18 U.S.C 3553 (a) (1)(C).

Mr. Williams has a significant criminal history, but that history is more than adequately reflected by calculating his guideline range using criminal category VI.  This criminal history, particularly in recent decades, reveals no propensity for violence, includes no weapons or drug offenses, and he was not arrested on any new offenses for nearly five years prior to his arrest for the current offense.  A sentence at the maximum of the guideline range is not justified by this criminal history.

**Conclusion**

A sentence at the bottom of the guideline range, or below, is adequate to meet the requirements of 18 U.S.C. 3353.  This should be a sentence of no more than 57 months, given an appropriate total offense level of 18.  If the Court declines a downward departure or variance and applies an offense level of 20 and a criminal history category VI, Mr. Williams should be sentenced at the bottom of that guideline range, which is no more than 71 months.

As noted in this Memorandum, certain information relevant to sentencing is not now available.  For this and other reasons, Mr. Williams intends to seek a continuance to assure that this information is available at sentencing.

Respectfully submitted this 3rd day of August, 2017.

*/s/ Michael J. Gallagher*
Michael J. Gallagher
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Telephone:  (303) 892-9400
Email:  Mike.Gallagher@dgslaw.com

Attorney for Defendant Alan Alonzo Williams

**Certificate of Service**

I certify that on August 3, 2017, I electronically filed the foregoing **DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE AND VARIANCE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Kathrine M. Aragon*
Kathrine M. Aragon