# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No.  15-cr-00395-REB

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

**1. ALAN ALONZO WILLIAMS,**

    **Defendant.**

---

### GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING STATEMENT

---

The United States of America respectfully submits the following response to Defendant's Sentencing Memorandum and Motion for Downward Departure and Variance (No. 58).  The government opposes the defendant's motions and requests a mid-range sentence, based on a guidelines range of 70-87 months.  Probation requests a sentence of 87 months.  The defendant requests a sentence of 57 months.

    *A.  Nature and Circumstances of the Offense*

The defendant pled guilty to bank fraud.  The facts of the offense are laid out in detail in the Plea Agreement (No. 44), but some highlights are included here.  Between 2006 and 2008, the defendant obtained $1,160,000 in loans and attempted to obtain another $550,000 loan for himself and a business called Williams Vending Company (WVC).  Because the defendant was a felon and a parolee, he would not qualify for the loans.  He therefore exploited an acquaintance's drug addiction in order to use her identity to obtain loans fraudulently.  The defendant acquired the loans by making numerous lies.  For example, he listed Ms. X as the 100% owner and president of WVC, even though the

1

defendant controlled the finances and operations of WVC and he and his family members owned the company. He gave Ms. X sole signature authority over three bank accounts, but he maintained control over these accounts. He told the Small Business Administration that she was the loan applicant and would serve as the personal guarantor. He explained that her minority status would allow government agencies to fulfill a portion of their minority contracting requirements by awarding contracts to WVC. The defendant provided false documentation showing that he had vending agreements with Peterson Air Force Base and Carmel Property Management, when in fact no such agreements existed. The defendant used a portion of the loan proceeds for personal purposes, including buying two new Mercedes Benz cars.

As part of the fraud, the defendant had Ms. X sign a contract to purchase a residence in Denver. He then arranged for her obtain a $900,000 loan for the house. The defendant caused Ms. X to present all sorts of false information to the lender in order to acquire this loan. Ms. X never resided in the house, but the defendant used the house to make it appear to WebBank that Ms. X had substantial assets.

With respect to the $550,000 loan that the defendant attempted to obtain, he falsely represented that Ms. X was the president and owner of WVC and he said that the funds were needed to purchase equipment for a contract WVC had entered into with the City and County of Denver. In fact, no such agreement existed. He also made it appear that WVC's liabilities had decreased significantly by producing a promissory note to Ms. X for approximately $200,000. The defendant did not intend to pay Ms. X the $200,000 as represented.

    I.    Loss Calculations

The nature of the offense is relevant in determining the applicable guidelines

range. According to the government's calculations, the defendant faces a guidelines range of 70-87 months, based on a total offense level of 20 and a criminal history category VI. The offense level is calculated from a base offense of 7 (§2B1.1(a)(1)) and specific offense characteristic of 16 additional levels for the amount of the loss exceeding $1.5 million. (§2B1.1(b)(1)(I)). Loss is defined as the greater of actual loss or intended loss. *See* §2B1.1 app. n. 3(A). "Intended loss" means "pecuniary harm that the defendant purposely sought to inflict." *Id.; see United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011). "The Court need only make a reasonable estimate of the loss." § 2B1.1 app. n. 3(C).

The defendant argues that he should receive only 14 additional levels under §2B1.1(b)(1)(H) for a total loss amount of more than $550,000 and up to $1.5 million. He has not challenged the Presentence Investigation Report's conclusion that the remaining balance on the loans he received from WebBank ($787.574.58 on an $800,000 loan from 2007 and $359,253.70 on a $360,000 loan in 2008) constitute actual loss (for a total of $1,146,828.28). (No. 55 at 5). But, he argues, the full amount of a $550,000 loan the defendant attempted to obtain from WebBank should not count towards "intended loss" for sentencing purposes, because the defendant would have used some portion of the $550,000 loan for the continued operation of his family business.

Actual loss here should be calculated by subtracting from the loan amount any payments the bank received and what collateral they could seize in order to offset the loss. *See* §2B1.1 app. n. 3(E)(ii). Although the defendant made payments to creditors of his business using a portion of the $1.16 million in funded loans, those payments did not result in a higher recoupment of collateral when the business went into receivership. After liquidation, the collateral was worth only approximately $30,000, and that money went to

3

Chase Bank, which had priority over WebBank. To argue, then, that successfully acquiring the $550,000 loan would have facilitated a more lucrative dissolution of assets when the company went into receivership, thus resulting in more collateral to offset the loss amount, is highly speculative.

At the end of the day, after the company had been through receivership, the actual loss to WebBank was the balance on the $1.16 million in loans, which was $1,146,828.28. It is reasonable, therefore, to infer that the defendant purposely sought to inflict a proportional amount of damage had he successfully acquired the $550,000 loan. For the $800,000 loan, the defendant had reduced the principal balance by only $12,425.42, a reduction of approximately 1.6%. For the $360,000 loan, the defendant had reduced the principal balance by $746.30, a reduction of approximately 0.22%. The natural and probable consequences of obtaining this third loan would likely have been the same – that very little of the principal would be repaid. *See United States v. Alli*, 444 F.3d 34, 39 (1st Cir. 2006) (calculating intended loss as stolen credit cards' aggregate credit limit because "[i]t was naturally and probably to be expected" that defendant's contacts who purchased stolen cards would charge as much as possible). *See, e.g.*, *United States v. Iwuala*, 789 F.3d 1, 13-14 (1st Cir. 2015) (calculating intended loss as amount defendant fraudulently billed Medicare, not the amount Medicare actually paid him); *United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007) (in mortgage fraud scheme, intended loss was "the value of the loans less the expected value of the properties" at the time of the fraud, even where victim banks recouped more money from later sale of properties).

Finally, to the extent the defendant is arguing that loan proceeds used legitimately should not count towards the loss calculation, regardless of whether the loans were acquired through fraudulent means, he has not produced any case law to support that

4

position. The test, rather, is the loss the defendant intended to inflict, which we can infer from the defendant's actions with respect to the funded loans, which he obtained using the same fraudulent means that he used in his attempt to obtain the $550,000 loan. *See United States v. Johnson*, 16 F.3d 166, 173 (7th Cir. 1994) (intended loss calculated as full value of loan acquired through fraud and misrepresentation, even though no actual loss suffered); *see also United States v. Banta*, 127 F.3d 982, 983-84 (10th Cir. 1997) (defendant liable for full value of car loans acquired through fraudulent means, even where cars were repossessed and resold, because defendant "could have inflicted a loss in the amount of the face value of the loans if he intended to permanently deprive the bank of the collateral by concealing the vehicles").

For these reasons, the government agrees with Probation that the full amount of the $550,000 unfunded loan should be included as "intended loss," thereby resulting in a total offense level of 20.

### B. History and Characteristics of the Defendant

The defendant's criminal history includes 15 felony convictions in 12 different state matters. Those convictions include, for example: Robbery and Forgery at age 19. Presentence Investigation Report ("PSIR") ¶¶ 60, 61. Theft, Second Degree Forgery, and Harassing Communication at age 20. PSIR ¶¶ 62-64. False Reporting at age 26. PSIR ¶ 69. Criminal Attempt to Commit Third Degree Burglary at age 28 and again at age 31. PSIR ¶¶ 70, 74. Third Degree Forgery, Theft, and False Reporting at age 29. PSIR ¶¶ 71-73. Theft (more than $400 to less than $15,000) at age 33, Theft (more than $15,000), and First Degree Aggravated Car Theft at age 34. PSIR ¶¶ 76-78. Attempted Third Degree Burglary at age 35. PSIR ¶ 79. Criminal Attempt to Commit Theft at age 46. PSIR ¶ 80. Identity Theft at age 49. PSIR ¶ 82.

The defendant argues that he had not had many recent convictions or arrests prior to his arrest in the instant case in March of 2016.  (No. 58 at 17).  Yet, it is simply not the case that the defendant had "cleaned up his act."  The defendant pled guilty to Criminal Attempt to Commit Theft, a felony, in 2009; to Harassment: Harmful/Painful Offense Conduct in 2011; and to Identity Theft, a felony, in 2011.  PSIR ¶¶ 80-82.  He also faces pending charges for Theft and Forgery in Denver from 2012 and for Forgery and Criminal Impersonation in Broomfield from 2016.  PSIR ¶¶ 87-88.  Between 2011 and 2016, the defendant failed to appear three times, resulting in the issuance of warrants.  PSIR ¶¶ 82, 87.  Moreover, the defendant was committing the instant offense during the brief "break" in convictions between 2006 and 2009.  In sum, there is no indication, based on his criminal history, that the defendant had tried to improve his behavior in a manner that warrants sentence mitigation.

The defendant also argues that few of the convictions relate to personal violence. (No. 55 at 7).  Yet the nature of the instant offense and the defendant's long history of committing thefts and frauds amply demonstrate the danger he poses to the community.

The defendant had a supportive and upper middle-class upbringing.  PSIR ¶ 91. His mother describes him as very intelligent.  PSIR ¶ 91, 93.  Thus, unlike many defendants, desperation and strife did not drive the defendant to commit the many crimes he committed.   For all of these reasons, a mid-range sentence is warranted.

    *C.  Other 18 U.S.C. § 3553(a) Factors*

As to the goal of achieving rehabilitation, the government agrees with Probation that the defendant could benefit from cognitive behavioral treatment during a period of supervised release. Although deterrence seems unlikely, given the defendant's persistent recidivism, a mid-range sentence is more likely to serve a deterrence function than a

lower sentence. In sum, the government believes that a mid-range sentence is sufficient, but not greater than necessary, to punish the defendant for his conduct in this offense.

Respectfully submitted this 2nd day of November, 2017.

        ROBERT C. TROYER
        Acting United States Attorney

        By: *s/ Rebecca S. Weber*
        REBECCA S. WEBER
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        Email: Rebecca.Weber@usdoj.gov
        Attorney for the United States

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 2nd day of November, 2017, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Michael John Gallagher**
mike.gallagher@dgslaw.com

**Julia Martinez**
julia.martinez@usdoj.gov

**Linda Kaufman**
Linda.Kaufman@usdoj.gov

By: *s/ Rebecca S. Weber*
REBECCA S. WEBER
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Email: Rebecca.Weber@usdoj.gov
Attorney for the United States