**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

Criminal Action No. 1:15-cr-00395-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    ALAN ALONZO WILLIAMS,

    Defendant.

---

**DEFENDANT'S S E C O N D SUPPLEMENTAL SENTENCING MEMORANDUM AND REQUEST FOR NON-GUIDELINE SENTENCE**

---

Mr. Williams submits this additional Supplemental Sentencing Memorandum in support of his previously filed Sentencing Memorandum and Motion for Downward Departure and Variance to address:

a. material facts and arguments evident from discovery and other documents that were not presented to the Court by prior counsel. These facts and arguments address the intended loss calculation as to whether it exceeded $1,500,000;

b. to provide the Court documentation relating to programing Mr. Williams has completed while incarcerated, and,

c. to update the Court as to Mr. Williams medical condition.

### a. Intended Loss Calculation

1

Prior counsel put substantial effort into obtaining information relating to how the funds from completed loans were used by Mr. Williams. This information is highly relevant to the Courts determination of the intended loss because of the weight the Court should give to an examination of the defendant's mental state as to how he would have intended to use unreceived funds. See *United States v Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (cited in the PSIR).

In the Addendum to the Presentence report (Document 66), Probation argues Mr. William's history of repayment on the completed loans somehow establishes an intent not to repay the denied loan. However, this claim ignores the provisions of the loans themselves and the economic realities of the time.

<u>The Loans</u>

The terms of the completed loans did not contemplate any short term repayment of principal. The major terms of first loan note with a principal amount of $800,000 (see Exhibit 1 – Loan - See page WB-00002449),[1] provided for:

a. a fluctuating interest rate that would change "every calendar quarter" and began at 9.75%,

b. required payments were set at the amount of $8,770.50 per month beginning

---

[1] Prior counsel's and present counsel's effort to reconstruct how funds were used has been frustrated by the age of the case. There is a limit on how long banking institution and the venders with which Mr. Williams did business kept records. More recent efforts to obtain such records by subpoena or release have met limited success. For example, Mr. Williams asserts that the cashier's checks he received went to venders of equipment and products and that the back of the checks would show that they were deposited by such venders. However, only the fronts of the cashier's check were originally obtained by the government and are in discovery. The backs of the checks are no longer available. Accordingly, as noted in prior filings, most documents cited in this Memorandum are found in the discovery provided by the government. Prior counsel noted that these documents are voluminous and "will not be provided to the Court prior to sentencing; paper copies, however, will be offered at sentencing" and that certain other materials would be attached. Instead, present counsel is providing the relevant documents as attachments to this motion.

2

      two months after the note was created, and,

    c. although pre-payment of the loan was permitted, the loan was not "due and payable (for) <u>14 years</u>."

This means the agreement contemplated that the monthly payment due in 2008 would total $87,775 (10 x $8,770.50). The interest portion of those payments would have to cover the whole year's interest which would be $78,000 (at 9.75%). This would have left only $9,775 going to principal in the first year by agreement of the parties.

    The major terms of second loan note (done by a modification of the first note (Exhibit 2 – Loan) had an eventual principal amount of $360,000 and provided for:

    d. a similar fluctuating interest rate,

    e. required payments were set at the amount of $4,344.46 per month beginning one month after the note was created, and,

    f. adopted the same provisions of the first loan that although pre-payment of the loan was permitted, the loan did not come due for <u>14 years</u>.

This means the agreement contemplated that the monthly payments due in 2008 would total $26,067.36 (6 x $4,344.46). The interest portion of those payments would be $17,550 (at 9.75%). This would have left only $8,517.36 going to principal in the first year by agreement of the parties.

    It appears the parties contemplated that very little principal would be paid on these $1,100,000 loans (approximately $18,000 per year) in the early years of the 14 year loan period. The obvious expectation was that this was a long term loan that would go on for years. The loan was obviously granted for the purpose and with the hope that Mr. Williams could expand the company and grow its value over the years. Thus,

3

Probation's assertion that the small principal repayment would have to cause one to have to "imagine that the defendant had some intent to repay the loans at an extremely faster rate than he had previously done" is far from imagination. It was the exact agreement and contemplation of the parties.

The Economy

Sadly, Mr. William's decision to use fraudulent means to obtain loans based on his motivation to expand the family business occurred at a point in time when the country was entering the "Great Recession." See https://en.wikipedia.org/wiki/Great_Recession_in_the_United_States. Mr. Williams was investing the loan proceeds in equipment and expanding operations that weren't fully in place till the summer of 2008. Within months, September 2008, there was a stock market crash. The associated near economic shutdown could only have contributed to Mr. William's business failure. Mr. William's is not asserting this was the cause of the failure. He acknowledges that his plan to expand the company was ill conceived. However, his substantial efforts almost immediately bumped up into this sinking economy which could not have but accelerated the failure.

Mr. Williams' Use of the Proceeds for Legitimate Business Purposes

Given the limits of the records available, prior counsel offered a reconstruction of how the loan proceeds were used. He was able to document that hundreds of thousands of the proceeds went to legitimate business purposes. He found documentation or interview references that established that at least $406,369.54 of the first loan, $177,806.57 of the second loan and all of the second draw on the second loan ($51,515.00) went to legitimate business purposes. He correctly noted that

Probation does not dispute the showing made by Mr. Williams in his Objections and Sentencing Memorandum that Mr. Williams used loan proceeds for legitimate business. However, Mr. William's believes it is important for the Court to know that the available documents establish that he used a much greater amount than previously documented by prior counsel.  Further review of the available record shows hundreds of thousands of dollars in additional loan proceeds used for legitimate business purposes as shown mostly by checks to third parties not identified in Mr. Williams' original sentencing memorandum.  This excludes other significant transactions with company venders which also occurred, but concerning which only limited records are available from the involved bank or venders.   In summary and as noted below, other than the funds used by Mr. Williams to purchase two cars, nearly all of the loans went toward expansion and operation of the company.

<u>Additional Use of Loan Proceeds – First Loan</u>

With respect to the first loan, the following additional sums were used for legitimate business purposes.  Prior counsel limited this analysis to the sum that was originally committed to operating expenses, $32,279.76.   However, Mr. Williams negotiated significant discounts in paying off other loans which provided extra cash for operating expenses.  Mr. Williams' purchase of used machines from Ross Vending also created cash that could be used for operating expenses.  Although not the intended purpose, he additionally used some of the distributions intended for loan payoffs for operating purposes.  Some of this funded the below listed additional expenses that were legitimate

business expenses[2]:

| Recipient | Date | Amount | Purpose | Documentation |
|---|---|---|---|---|
| Jim Moldane | 12/31/2008 | $ 39,200.00 | Loan brokerage fee | WF_00000734 |
| Seven Up | 1/3/2008 | $ 18,000.00 | Product | WF_00000530 |
| Bloom Realty | 1/3/2008 | $ 23,000.00 | Warehouse rent | WF_00000531 |
| Medved | 1/3/2008 | $ 3,100.00 | Supply truck repairs | WF_00000532 |
| Penske Rental | 1/3/2008 | $ 5,842.46 | Delivery truck rental | WF_00000533 |
| Soft Delivery | 1/3/2008 | $ 10,123.20 | Product | WF_00000807 |
| AMX | 1/4/2008 | $ 2,405.52 | AMX - various business expense DETAIL! | WF_00000570 |
| Coca Cola | 1/5/2008 | $ 5,000.00 | Product | WF_00000535 |
| Soft Delivery | 1/10/2008 | $ 7,500.00 | Product | WF_00000811 |
| Cash | | $ 30,000.00 | "Beverage purchase" noted in memo line. Mr. Williams often used cash to purchase product to obtain a cash discount from wholesalers. | WF_00000765 |
| Web Bank | 2/3/2008 | $ 8,334.24 | Loan payment | WF_00000736 |

---

[2] All of the Wells Fargo documents (WF xxxxxxxx) are attached as Exhibits 3a, 3b and 3c in the order presented herein.

| | | | | |
|---|---|---|---|---|
| Web Bank | 2/5/2008 | $ 8,334.24 | Loan payment | WF_00000737 |
| Sam's Club | 3/5/2008 | $ 1,221.88 | Product | WF_00000787 |
| Michael Bloom Realty | 2/20/2008 | $ 1,400.00 | Warehouse rent | WF_00000796 |
| AMX | 2/20/2008 | $ 2,000.00 | AMX - various business expenses | WF_00000572 |
| Wells Fargo | 2/12/2008 | $ 78.97 | Bank Service charge - DEBIT | WF_00000572 |
| Maaliki Motors | 2/20/2018 | $ 2,000.00 | Truck repair | WF_00000722 |
| Wells Fargo | 2/20/2008 | $ 5,000.00 | Principal Payment | WF_00000743 |
| Equipment Purchase | 2/21/2008 | $ 28,000.00 | Mr. Williams purchased equipment to go with vending machines. "Equipment Aspects" noted on memo line | WF_00000799 |
| HFC/Beneficial | 2/25/2008 | $ 1,500.00 | Payments associated with loan | WF0000783 |
| HFC/Beneficial | 2/25/2008 | $ 200.00 | Payments associated with loan | WF0000782 |
| Elevations | 2/25/2008 | $ 1,695.91 | Payments associated with loan | WF0000790 |
| Wells Fargo | 4/8/2008 | $ 1,554.08 | Loan Payment - debit | WF0000576 |
| Wells Fargo | 4/29/2008 | $ 1,058.00 | Loan Payment- debit | WF0000576 |
| HFC/Beneficial | 4/15/2008 | $ 450.00 | Payments associated | WF0000781 |

7

| | | | with loan | |
|---|---|---|---|---|
| Anthony Mastin | 4/22/2008 | $150.00 | Payment to employee | WF0000760 |
| HFC/Beneficial | 4/29/2008 | $250.00 | Payments associated with loan | WF0000760 |
| TOTAL | | $207,398.50 | | |

During this period some of the first loan proceeds were deposited in another company account (Wells Fargo # 144-5071129). This account was used by Mr. Williams' father to pay regular small expenses, such as utilities. These payments average approximately $2,000 a month. See WF0000605-630. This totaled another approximately $24,000 that went to legitimate purposes.

If one deducts from these operating expenses the $32,279.76 prior counsel already deducted and adds the remainder to prior counsel's total, this identifies approximately $606,147 in funds that went to legitimate expenses relating to the original $787,000 in loan proceeds.

At the same time, Mr. Williams was using loan proceeds to purchase product from wholesale suppliers and retailers such as Costco and Sam's Club. As noted previously, records showing that cash went to wholesale suppliers are not available and also not available from Costco, but Sam's Club did provide records.[3] The records document that from December 2007 onward, Mr. Williams spent on average $3,500 a month a Sam's Club. An example month of the records is attached as Exhibit 4. It was Mr. Williams' practice to purchase items for resale from both Sam's Club and Costco depending on which retailer had the best price. He on average spent at least equal

---

[3] The records were provided in response to a subpoena ducas tecum and the originals are in possession of the court administrator.

amounts at both retailers. This means he spent approximately $7,000 a month on product, yet checks to Sam's Club (as noted above) only totaled $1,221.88 paid in out in March 2008. The other payments to Sam's Club and Costco were obviously in cash. This documents an additional approximate $31,000 of cash proceeds expended from the first loan proceeds, resulting in a total of $637,000 of legitimate expenses relating to the original $787,000 in loan proceeds.

<u>Additional Use of Loan Proceeds – Second Loan</u>

With respect to the second loan, the following additional sums were used for legitimate business purposes. Prior counsel listed checks totaling $177,806.57. However, there were extensive legitimate business expenses that for reasons unknown to present counsel were not included. These included:

| Recipient | Date | Amount | Purpose | Documentation |
|---|---|---|---|---|
| Erickson | 5/12/2008 | $4648.05 | Loan to employee | WF0000763 |
| Travel | 5/15/2008 | $1498.04 | Travel expenses relating to Ross Equipment Purchase | Debit - WF0000579 |
| Frontier Airlines | 5/15/2008 | $566.39 | Travel expenses relating to Ross Equipment Purchase | Debit - WF0000579 |
| Chris Caruso | 5/20/2008 | $9500.00 | Delivery truck purchase | WF0000779 |
| American National Bank | 5/29/2008 | $1700.00 | Payroll | WF0000798 |
| HSBC | 6/9/2008 | $800.00 | Payment associated | WF0000800 |

9

| | | | | |
|---|---|---|---|---|
| | | | with loan | |
| Coca Cola | 7/7/2008 | $326.35 | Product | WF0000742 |
| Web Bank | 6/4/2008 | $6975.2 | Loan Payment | WF0000724 |
| Michael Bloom Realty | 6/10/2008 | $3200.00 | Warehouse Rent | WF0000735 |
| American National Bank | 6/20/2008 | $1600.00 | Payroll | WF0000789 |
| Arapahoe County Clerk | 6/25/2008 | $1442.15 | Truck property tax | WF0000725 |
| Travel | 7/2-7/2008 | | Travel expenses relating to Ross Equipment Purchase | WF0000588 |
| Web Bank | 7/5/2008 | $4600.00 | Loan Payment | WF0000728 |
| Web Bank | 7/5/2008 | $8000.00 | Loan Payment | WF0000727 |
| Vending Security | 7/25/2008 | $1164.29 | Equipment | WF0000589 |
| Web Bank | 8/5/2008 | $4345 | Loan Payment | WF0000732 |
| American National Bank | 8/2/2008 | $1515.12 | Loan Payment | WF0000793 |
| Metro Printing | 8/6/2008 | $1347.85 | Brochures | WF0000731 |
| TOTAL | | $53,228.44 | | |

All of the above was in additional to various cash withdrawals Mr. Williams converted to cashier's checks and used to make payments to venders. If one includes the $7,000 a month that went to Costco and Sam's Club for the remainder of 2008, $56,000, the total legitimate use of the proceeds was $287,035 of the $300,000 loan.

Had Mr. Williams been intending to use the cash for personal purposes, he would

10

have had no reason to obtain the cashier's checks in the first place. Mr. Williams hoped he could obtain bank records showing the backs of cashier's checks to provide the Court more exact documentation of the expenditures. However, even without that documentation, and other than the approximately $80,000 used to purchase personal vehicles, the above information establishes that he used nearly all of the loan proceeds for legitimate purposes.

Any suggestion that Mr. William's sole intentions for the period he ran the company was to simply get himself large sums of money is counter to the documentation. He paid employees, he stocked product, he tried to expand the number of vending machines operated by the company, he committed to a lease on a new warehouse, rented by Gateway LLC, shortly before the company went into receivership. All this conduct is counter to such an intent.

Given that Mr. Williams used nearly all of the prior loan proceeds for legitimate business purposes and the lack of relevance of Probation's assertions relating to the scope of loan repayments, the weight of the evidence shows that Mr. Williams did not intend to cause a loss in the full amount of the unfunded loan. Accordingly, Mr. Williams' believes his objection to the PSR's calculation of guideline loss should be sustained, and his sentence based on the 14-level enhancement of U.S.S.G. § 2B1.1(b)(1)(H), not the 16-level enhancement of § 2B1.1(b)(1)(I) applied in the PSR.

### b. Programming Completed by Mr. Williams

Prior counsel discussed programs completed by Mr. Williams. Mr. Williams has completed three programs:

November 2017 – Good Intentions Program (certificate attached - Exhibit 5)

December 2017 – Emotional Self-Regulation

2018 -  Cognitive Therapy.

### c. Mr. Williams' Medical Condition

Mr. Williams was first incarcerated in FDC in March 2016. Over time he raised his concerns regarding his knee with staff, but he was not actually taken to be examined by adoctor until November 2017.   As noted in records previously filed with Mr. Williams Motion to Continue Sentencing, he has "degenerative joint disease of right knee" and that "ultimately he will need a knee replacement." The knee has continued to degenerate and he now needs to use crutches to move even short distances.  His orthopedist, Dr. Jeffery Arthur, has provided the attached letter, Exhibit 6, further detailing Mr. Williams' condition and notes that there are no other treatment options available.

Also as noted in the Motion to Continue, while in FDC, Mr. Williams progressively began to suffer from an enlargement of a hernia.  He was examined in April 2017 and surgery was recommended.  He had surgery on January 24, 2018.  However, he has not done well post-operatively.  He was taken back for a scan and it was determined that he needs additional surgery to re-repair the hernia.  He has been told this has been scheduled but as of this date the surgery has yet to occur.  Accordingly, Mr. Williams is again filing a Motion to Continue concurrently with this filing.

It is evident to Mr. Williams that he is unlikely to be provided knee replacement surgery while at FDC and even more unlikely to be provided such surgery by the Bureau of Prisons.  He cannot exercise which contributes further to the degeneration of

12

his knee. There is little doubt his whole time in prison will be spent on crutches. He will continue to deteriorate. He will not be able to remedy this until he is released and can obtain a knee transplant out of custody.

Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed . . .medical care . . . in the most effective manner." Here the need cannot realistically be fulfilled until Mr. Williams has been released. Medical needs have been recognized by the courts as justifying reduced sentences. See for example: •*United States v. Alemenas*, 553 F.3d 27 (1st Cir. 2009) (after granting departure from career offender guideline for defendant charged with crack distribution, district court also varied 43 months below the reduced range citing defendant's chronic neck pain and his mental and emotional condition.); *United States v. Spigner,* 416 F.3d 708 (8th Cir. 2005) (although defendant who sold more than 50 grams of crack had agreed not to ask for downward departures based on health, case was remanded because district court could still impose a sentence lower than the suggested range and § 3553(a)(2)(D) required court to consider the need to provide medical care in the most effective manner where defendant suffered from high blood pressure so severe it resulted in kidney failure, required regular dialysis treatment and surgery); *United States v. Garcia-Salas*, 260 Fed. App'x 27 (10th Cir. 2007) (unpublished) (sentence at bottom-end of guideline range reversed and remanded for resentencing because it is clear 10th Circuit precedent had effectively foreclosed variances and post-*Gall* and *Kimbrough*, district court had greater sentencing discretion than it thought it did; defendant argued for a lower sentence for his extraordinary physical impairment, vulnerability in prison, extraordinary family circumstances, and

13

mental and emotional condition). *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004) (in tax fraud case, three level downward departure proper (and possibly more on remand) where "several serious medical conditions make Martin's health exceptionally fragile [and] . . . we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term [and] [t]here is a high probability that lengthy incarceration will shorten Martin's life span").

Wherefore, Mr. Williams requests a non-guideline sentence as described in his original Sentencing Memorandum.

Dated: September 7, 2018

Respectfully submitted,

*s/ Steven K. Jacobson*
Steven K. Jacobson
Collins, Rafik and Jacobson LLC
1881 9th St., Suite 315
Boulder, Colorado  80302
Telephone:  303-444-9292
Fax:  303-447-0200
e-mail:  steve@collinsrafik.com

CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on September 7, 2018, I electronically filed the foregoing **DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM** with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to all counsel of record in this case.

*s/ Steven K. Jacobson*
Steven K. Jacobson