IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLORADO

Criminal Action No. 1:15-cr-00395-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    ALAN ALONZO WILLIAMS,

    Defendant.

_____

**DEFENDANT'S THIRD SUPPLEMENTAL SENTENCING MEMORANDUM
AND REQUEST FOR NON-GUIDELINE SENTENCE**
_____

Mr. Williams submits this additional Supplemental Sentencing Memorandum in support of his previously filed Sentencing Memorandum and Motion for Downward Departure and Variance to further address Mr. Williams' medical condition and other issues:

### A. The History of Mr. William's Receiving and Not Receiving Timely Medical Treatment While this Matter Has Been Pending.

Mr. Williams was first incarcerated in FDC in March 2016. While in FDC, Mr. Williams progressively began to suffer from an enlargement of a hernia. He was examined in April 2017 and surgery was recommended. The condition caused him substantial pain and restricted his activities. He could not ambulate without crutches.

1

Even though surgery was recommended, his condition was not addressed again until October 24, 2017, over five months later. He remained in significant pain during this period and remained on crutches.

At that time surgery was ordered for a target date of November 28, 2017. However, surgery was not actually performed until January 24, 2018. During this period he was in substantial pain and remained on crutches.

At the time of surgery, the Doctor discussed with Mr. Williams that the repair would be to the hernia on his right side. Mr. Williams also had an inguinal hernia on his left side. The Doctor felt that it did not yet need repair.

Soon after surgery, Mr. Williams felt significant pain on both his lower right and left sides. He was concerned because his original patient discharge instructions directed that he have a follow up appointment within "10-14" days, but this was never scheduled by FDC staff. Exhibit One – Discharge Instructions. Mr. Williams believed that his pain was associated with the mesh used to repair his surgery having stretched soon after the operation as a result of severe constipation resulting in the need for a re-repair. This is not an uncommon condition. "The distinction between a recurrence and bulging of the mesh remains difficult even with radiological examinations but is therapeutically irrelevant in symptomatic patients." See on-line at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5061296/. The article notes that "(i)t is possible that the repair is still intact and bulging of the mesh causes swelling."

Mr. Williams was not thereafter re-examined by the surgeon until March 23, 2018. At that time the doctor expressed concern that Mr. Williams was

2

"extraordinarily tender down in the right lower quadrant." Exhibit Two – Tillquist 2/23/18. The Doctor wanted to rule out any other pathology and wanted a CAT scan done.

The FDC authorities never scheduled a CT scan. Mr. Williams continued to be in significant pain. He was not again returned to the see the surgeon for over five more months and no CT scan was performed.

Mr. Williams was finally again examined by the surgeon on August 28, 2018. Exhibit Three. The surgeon again recommended that a CT scan be done so that the surgeon could "make recommendations based on that." This was the same recommendation as made five months before with no action taken by FDC staff to arrange for a CT scan.

A CT scan was finally performed on November 15, 2018. This was eight months after the surgeon requested it. The FDC medical staff has asserted that it appeared normal. However, counsel was informed by Dr. Tillquist's staff that he has never been provided the CT scan to examine and the medical records provided to counsel by Dr. Tillquist's office have no entries relating to his consideration of the CT scan results.

On December 18, 2108, in order to clarify Mr. Williams' medical condition, the Court entered an order directly the FDC warden to provide the Court a report clarifying Mr. Williams' medical condition and the need for treatment. No response was provided the Court even after the Court issued several show cause orders which were served by certified mail. A response was not actually filed until April 3, 2019. It

is counsel's understanding the facility maintains it wasn't aware of the Court orders until shortly before the response was filed.  It would appear the facility was ignoring the Court not unlike they were ignoring Mr. Williams' situation.

Because of the non-responsiveness of the Warden, Counsel attempted to get records from the provider to clarify Mr. Williams' condition.  Counsel received the attached records in response.  Exhibits Two and Three.  As noted in the attached fax cover sheet, Counsel had been previously told by Dr. Tillquist's office that the doctor needed to see the CT scan to direct future planned surgery.  Exhibit Four – Fax. This now appears not to have been the case and the doctor needed the CT scan to determine if further surgery was needed.

Mr. Williams was never informed of the results of the CT scan until he saw medical staff January 22, 2019.

Mr. Williams has been in substantial pain as a result of his abdominal condition and remains so to this date.  It appears he will never receive any treatment for his condition given the stated positions of the authorities and will remain in substantial pain for the remainder of any period of incarceration imposed by the Court.

Mr. Williams' continuing abdominal pain is in combination with the condition of his deteriorated knee. This is another condition which the authorities in effect continue to ignore.  This condition also dramatically limits his movement and causes him pain.  As noted in the attached record from a year and a half ago, Exhibit Five – Report,  and letter previously provided the Court, Exhibit Six, Mr. Williams will "ultimately . . . need a knee replacement."   When he was taken to see the

4

orthopedist he was given a brace and an injection at that time. He tolerated the injection well indicating he was a candidate for continued injections to manage the pain. He was given a brace. However, he has never been returned to get more injections so the pain relief has been limited. His brace has worn out and has never been replaced. He has made regular requests of medical staff relating to getting a new brace. Counsel contacted the provider eight months ago noting that the brace was worn out and needed replacing. No new brace has been provided. He is presently using an inappropriate complete leg brace that was abandoned by another inmate, since an appropriate one has not provided by the medical staff.

Throughout Mr. Williams' incarceration, Mr. Williams has regularly informed counsel about his medical condition and the pain he was experiencing. At the same time, Mr. Williams regularly informed counsel that he was told that "things took time" and care would be timely provided. Mr. Williams believed this and patiently waited. In the belated response to the Court's order, the Warden notes the times Mr. Williams would come up to the Warden on his rounds, during the months and months Mr. Williams was literally being ignored.  It was not on "one occasion" that Mr. Williams would tell the Warden that he was supposed to get surgery, he was supposed to get injections, he was supposed to be getting a new brace, that he was supposed to be getting a CT scan, it was every occasion. Every time he was told "be patient . . . things took time" and care would be timely provided. Mr. Williams was repeatedly told by some medical staff that he was "going out" to see Dr. Tillquist and the orthopedist. Then he was told by other staff that Dr. Tillquist didn't need to see him anymore. Then he was again told by other staff that he was scheduled to go out.

This appears to have never been the case.

### B. The Small Likelihood that Mr. Williams Will Receive Reasonable Medical Care Once Sentenced Supports a Variance

It is well recognized that "medical care proved to prisoners incarcerated in the Federal Bureau of Prisons is generally lacking, although not completely deficient." https://www.prisonerresource.com/medical-care/medical-care-federal-bureau-prisons/   However, where it is completely deficient relates the fact that "(m)any inmates with a serious chronic physical illness fail to receive care while incarcerated." *The Health and Health Care of US Prisoners: Results of a Nationwide Survey*, Am J Public Health. 2009 April; 99(4): 666–672.  It is these chronically ill inmates, like Mr. Williams, who get ignored:

> "(I)f the federal inmate has a non-acute medical condition (e.g., a torn or damaged ligament, an injured hip, neurological problems, gender identity disorder, etc.), care will not generally be forthcoming to an acceptable standard of care.  Common experience indicates that a plethora of medical ailments are either not treated by Federal Bureau of Prisons' health services staff or are treated through less expensive, and less effective, means (e.g., Ibuprofen to treat migraines, fractured bones, torn ligaments, neurological problems, etc.).
>
> https://www.prisonerresource.com/medical-care/medical-care-federal-bureau-prisons/

This is the case even though the obligation to provide inmates with adequate medical care is a constitutional requirement under the Eighth Amendment:

> A prison's failure to provide sustenance for inmates "may actually produce physical 'torture or a lingering death.' " Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

6

> \*\*\*
> Courts . . . must not shrink from their obligation to "enforce the constitutional rights of all 'persons,' including prisoners." Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.
> *Brown v. Plata*, 563 U.S. 493, 1928-1929 (2011) (citations omitted) (emphasis added).

In 1994, the General Accounting Office "issued a report about health care in the Bureau of Prisons [which] . . . concluded that inmates with chronic illnesses were not receiving proper health care. . ." *United States v. Sherman*, 53 F.3d 782, 786 at n.7 (7th Cir. 1995). Things have not changed since the 1994 report. The medical care afforded by the BOP, such as it is, has been recently criticized by the Inspector General of the Justice Department. *See* Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015). https://oig.justice.gov/reports/2015/e1505.pdf. This study found "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose." *Id.* at ii. The lack of adequate staffing leaves inmates with limited access to medical care. *Id.* at 17-19.

Even though this failing is obvious and has been proven out in Mr. Williams' case, counsel understands that the BOP continues to send Courts "a form letter trumpeting the BOP's ability to handle medical conditions of all kinds." *U.S. v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000).

### C. Both a Departure and Variance Analysis Apply in This Case.

Under 18 U.S.C. § 3553(a)(2)(D), the need for medical care is a sentencing factor which can support a variance. The United States Sentencing Guidelines also provide authority for departing downward based on a defendant's poor health.

7

Under U.S.S.G. § 5H1.4, a below guideline sentence is appropriate when "an extraordinary physical impairment may be a reason to depart downward . . . ." A Court can consider the constellation of a defendant's conditions in conducting such a departure analysis. *U.S. v. Moy*, 1995 WL 311441, at 26-29. Additionally, a downward departure "may be appropriate to accomplish a specific treatment purpose," and even allows for consideration of home detention or other alternatives when a defendant is "seriously infirm[ed]." U.S.S.G. § 5H1.4.

Given the history outlined above there is little doubt that Mr. William's will be relegated to being in constant pain during any future incarceration. Mr. Williams in effect has two painful chronic conditions, neither of which he will be able to be remedied until he is released or able to seek medical treatment on his own if serving an alternative sentence. This is something he could do were he serving an alternative sentence.

Courts have historically recognized that significant variances or departures are justified for chronically ill defendants, including alternatives other than sentences to prison. For example in a case cited in prior pleadings, *U.S. v. Martin,* 363 F.3d 25 (Fifth Cir. 2004), a defendant involved in a $1.8 million fraud scheme who suffered from debilitating Crohn's disease was granted home detention and probation. Although the case was reversed and remanded for resentencing for other reasons, the Court found that the trial court correctly considered that "the Bureau of Prisons would be unable to adequately meet the defendant's medical needs" in imposing the sentence. Id. at 49. The Court cited with approval that even under the pre-*Booker* sentencing scheme "a sentencing court is not faced with an all-or-nothing choice

8

between GSR-range imprisonment or no imprisonment, but may lawfully decide to impose a reduced prison sentence below the (guidelines)." *United States v. Hilton,* 946 F.2d 955, 958 (1st Cir.1991).

### D. Mr. Williams' Age

In prior counsel's original sentencing memorandum, he argued that Mr. Williams' advanced age and his low risk of recidivism upon release mean that a guidelines-range sentence in this case would disproportionately affect the Defendant and provide greater punishment than necessary. Since making this argument, the United State Sentencing Commission has issued a report titled: The Effects of Aging on Recidivism Among Federal Offenders, December 2017. The conclusions in the report further validate counsel's argument.

In the Key Findings of the report, the Commission conclusions included among others:

a. "Older offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release."

b. Even "(f)or offenders in Criminal History Category VI," the re-arrest rate was less than half that for younger offenders.

c. "(F)or offenders age 60 and older at the time of release, the re-arrest rates were . . . 12.5 percent (fraud)" compared to "53.6 percent (fraud)" "for offenders under age 30 at the time of release."

All these conclusions suggest that Mr. Williams' presents little future risk and lessens the need for a sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(c).

### E. Conclusion

Mr. Williams asks to the Court to weigh heavily his ongoing suffering over the three years he has so far been incarcerated, the fact that he has pending state cases that will almost assuredly add to any period of incarceration and the fact that he offers little risk to re-offend.  Accordingly, Mr. Williams requests a non-guideline sentence that offers him the soonest opportunity to obtain treatment.

Dated:   June 4, 2019

Respectfully submitted,

*s/ Steven K. Jacobson*
Steven K. Jacobson
Collins, Rafik and Jacobson LLC
1881 9th St., Suite 315
Boulder, Colorado  80302
Telephone:  303-444-9292
Fax:  303-447-0200
e-mail:  steve@collinsrafik.com

CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on June 4, 2019 I electronically filed the foregoing **DEFENDANT'S THIRD SUPPLEMENTAL SENTENCING MEMORANDUM** with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to all counsel of record in this case.

*s/ Steven K. Jacobson*
Steven K. Jacobson