**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 15-cr-00395-REB

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

**1. ALAN ALONZO WILLIAMS,**

    **Defendant.**

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING STATEMENTS**

---

The United States of America respectfully submits the following response to Defendant's Sentencing Statement and Motion for a Downward Departure and Variance (No. 58), Second Supplemental Sentencing Statement (No. 110) and Third Supplemental Sentencing Statement (No. 145). The government stands by its earlier request for a mid-range sentence within the guidelines range of 70-87 months. (*See* No. 67).

Additionally, the government "renews" its pending Motion for Decrease of Acceptance of Responsibility (No. 52) and Motion to Dismiss Counts (No. 53).

**I.  Procedural History**

The defendant pled guilty on January 12, 2017 to violating 18 U.S.C. § 1344, Bank Fraud. (Nos. 43, 44). Sentencing was originally scheduled for April 6, 2017. (No. 43). It was later rescheduled for July 6, 2017, and then again to August 17, 2017. (Nos. 50, 57). On June 15, 2017, the defendant filed an Objection to the Presentence Report that largely focused on the issue of intended loss. (No. 55). The defendant then submitted a Sentencing Memorandum and Motion for Downward Departure and Variance. He

1

requested a sentence of 57 months. (No. 58). The sentencing was again rescheduled – to November 15, 2017. (No. 60). On November 2, 2017, the government filed a response to the defendant's sentencing statement. (No. 67). The defendant responded with a Supplemental Sentencing Memorandum. (No. 68). The defendant then sought and received new counsel. (Nos. 70, 78). With the sentencing reset for September 26, 2018 (No. 108), the defendant filed a Second Supplemental Sentencing Statement. (No. 110). The sentencing was eventually reset for June 19, 2019. (No. 143). The defendant filed a Third Supplemental Sentencing Statement on June 4, 2019. (No. 145). The government now files this response, and incorporates its earlier response (No. 67) herein.

## II.    Argument Concerning Loss

As the Court is well aware, the defendant obtained $1,160,000 in loans and attempted to obtain another $550,000 loan for himself and a business called Williams Vending Company ("WVC"). The loans were obtained through a series of false statements, which are detailed at length in the Plea Agreement. (No. 44). Because the defendant was a felon and a parolee, he would not qualify for the loans. He therefore exploited Ms. X, an acquaintance with a severe drug addiction, in order to use her identity to obtain loans fraudulently. For example, he listed Ms. X as the 100% owner and president of WVC, even though the defendant controlled the finances and operations of WVC and he and his family members owned the company.

The defendant attempted to obtain the $550,000 loan, specifically, by falsely representing that the funds were needed to purchase equipment for a contract WVC had entered into with the City and County of Denver, when in fact no such agreement existed. He also presented a fraudulent document that inflated Ms. X's account balance. Finally, he falsely claimed that WVC had reduced its debt to Ms. X by about $430,000 and

produced a fraudulent promissory note in support. (No. 44 at 11-12). WebBank ultimately denied the requested $550,000 loan, avoiding an additional $550,000 in actual loss.

The government asserts that the defendant should receive a 16-level increase under § 2B1.1(b)(1)(I) to reflect the amount of the actual loss ($1,160,000) plus the intended loss ($550,000). The defendant argues that the full amount of the $550,000 loan should not count towards "intended loss" for sentencing purposes, because the defendant would have used a large portion of the $550,000 loan for the continued operation of his family business. He therefore argues that he should receive only a 14-level increase pursuant to § 2B1.1(b)(1)(H).

The government stands by the arguments set forth in its earlier sentencing response (No. 67) that, as a legal matter, whether the defendant would have used the $550,000 loan proceeds for his business is irrelevant to the question of intended loss. Aside from the legal and factual arguments previously set forth, the government raises a few other considerations below, which are relevant under 18 U.S.C. § 3553(a). Additionally, the government responds to the defendant's motion concerning his medical condition. (No. 145).

### III.     Response to Claimed Expenditures

In his sentencing statements, the defendant catalogues additional expenditures he purportedly made for legitimate business purposes using loan proceeds. For example, he details payments of approximately $406,000 to creditors of WVC, using loan proceeds.[1] (No. 58). The first loan specified that approximately $781,855 should go to

---

[1] The defendant's first sentencing statement estimated that $406,369.54 was directed to creditors, and noted that he was awaiting documentation from two creditors regarding an additional approximately $55,000. (No. 58). The defendant's second sentencing statement detailed a number of additional purportedly legitimate business expenses,

creditors; accordingly, the defendant has advanced evidence showing he used just over one-half of the money for paying off creditors. The defendant has admitted he made these payments to creditors without obtaining the required co-endorsements from the joint payees. (*Id.*, No. 44 (Plea Agreement at 9)). Not obtaining those co-endorsements allowed the defendant to keep a portion of those payments for WVC, rather than pay the full amount to creditors as required by the terms of the loan. (No. 44). Even if he used some of the remaining balance for business expenses, he still did not use that money as WebBank had directed, adding another layer of dishonesty to his actions beyond the initial false statements he made in obtaining the loans.

Furthermore, the defendant does not dispute that he purchased two Mercedes Benz automobiles for himself and his daughter using loan proceeds. (No. 44). Other items that the defendant categorizes as legitimate business expenditures are questionable. For example, the $3,100 payment on January 3, 2008 to "Medved Hummer" for "supply truck repairs" was likely for the defendant's Hummer. (*See* No. 110 Ex. 3 at 4). The $30,000 cash payment with "(beverage purchase)" in the memo line raises eyebrows. (No. 110 Ex. 3 at 10). As does the $28,000 cash payment for "equipment aspects" on February 21, 2008. (No. 110 Ex. 3 at 17). Finally, the travel expenditures from May 15, 2008 ($1,498.04 and $566.39) likely relate to a trip the defendant made to Chicago, not to California to purchase items from Ross Equipment. (No. 110 Ex. 5 at 2; *see* record from Colorado Department of Corrections, attached as Ex. 1, and hotel bill, attached as Ex. 2). While in Chicago on May 16, 17, and 18, 2008, the defendant stayed at the Trump International Hotel at a rate of $1,475 per night, for a

---

and added those to the category of "working capital." But the terms of the loan specified only $32,279.76 to go towards working capital for WVC.

total of $4,277 that he spent out of his Wells Fargo account after the second loan of $300,000 was deposited.

These facts concerning the nature and circumstances of the offense provide additional justification for a mid-range guideline sentence.

### IV. Response to Defendant's Third Supplemental Sentencing Memorandum (No. 145)

The defendant's most recent sentencing document seeks a downward departure and variance largely on the basis of the defendant's medical condition. (No. 145). Neither a departure nor a variance is warranted on these grounds because the defendant has received sufficient medical care while in custody, and because many of the defendant's assertions about his care do not appear to be true.

The defendant argues that he has not received timely medical treatment for a hernia. He points to (a) a nine-month delay in receiving hernia surgery; (b) insufficient care immediately after the surgery; and (c) delays in receiving a CT scan to address ongoing pain. The defendant also contends that he has received inadequate treatment for knee pain, in part because he has not been given a new knee brace since initially receiving one.

The Bureau of Prisons provided a declaration from a medical professional addressing the defendant's medical care while in custody. (Nos. 149, 150). Between March 18, 2016 and June 7, 2019, the defendant had 215 encounters with medical providers. (No. 150 Ex. A). It is true that the defendant did not receive hernia surgery until January 2018, nine months after surgery was recommended. But, contrary to the defendant's assertion, he was seen immediately after the January 24, 2018 surgery – first by an EMT the same day, then by a mid-level provider two days letter, and then by a nurse practitioner six days later. (No. 150 Ex. B).

5

On March 23, 2018, a doctor requested a CT scan. That scan was completed on June 1, 2018 and was unremarkable. (No. 150 Ex. D). This contradicts the defendant's assertions that no CT scan was performed until November 15, 2018. The defendant's omission of this first CT scan is surprising, given that in a visit on June 21, 2018, he insisted that the "CAT scan is wrong." (No. 150 Ex. F). He also refused counseling, education, stretching, diet, or medication and demanded a new CT scan. Then, on July 6, 2018, a doctor explained to the defendant that the CT scan was "essentially unremarkable." (No. 150 Ex. G). On August 28, 2018, an outside provider ordered another CT scan, even though he did not feel any recurrence and did not note any hernia on either the right or left side. (No. 150 Ex. I). This second CT scan was performed less than three months later, on November 15, 2018. The results showed no acute inflammation or obstruction. (No. 150 Ex. M). With respect to the defendant's claims concerning a knee brace, he has received neoprene knee braces four times, on September 19, 2017, August 9, 2018, October 24, 2018, and March 19, 2019. (No. 150 Ex. O).

In sum, the defendant appears to have received attentive medical care. His assertions concerning many of the delays do not appear to be true. Accordingly, he deserves neither a departure nor a variance on these grounds.

**V.      Conclusion**

For the reasons set forth herein and in the government's first sentencing statement (No. 67), the government requests a sentence in the middle of the 70-87-month guideline range.

          JASON R. DUNN
          United States Attorney

          By:  *s/ Rebecca S. Weber*
          REBECCA S. WEBER
          Assistant United States Attorney
          United States Attorney's Office
          1801 California Street, Suite 1600
          Denver, Colorado 80202
          Telephone: (303) 454-0100
          Email: Rebecca.Weber@usdoj.gov
          Attorney for the United States

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 12th day of June 2019, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING STATEMENTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

      By: *s/ Rebecca S. Weber*
REBECCA S. WEBER
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Email: Rebecca.Weber@usdoj.gov
Attorney for the United States

8