**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 23, 2021**

Christopher M. Wolpert
**Clerk of Court**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 19-1229 |
| ALAN ALONZO WILLIAMS, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CR-00395-REB-1)**
_____

Beale Tejada of Crane & Tejada, P.C., Denver, Colorado (Keith Bradley and Corey McGehee of Squire Patton Boggs LLP, Denver, Colorado and Phoenix, Arizona on the briefs), for Defendant-Appellant.

Elizabeth S. Ford Milani, Assistant United States Attorney (Jason Dunn, United States Attorney, and Paul Farley, Assistant United States Attorney, on the brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Alan Williams pleaded guilty to a single count of bank fraud under 18 U.S.C.

§ 1344 and stipulated to restitution tied to that count and two other soon-to-be-dismissed

bank-fraud counts. The government got its conviction, and Williams limited his

sentencing exposure and possible future charges. Now Williams steps back from his bargain, seeking to keep what benefits him (his favorable plea deal) while contesting the very restitution he stipulated was owed. And though he didn't raise the issue below, he now contests the district court's apportionment of that total restitution between WebBank and Wells Fargo Bank, as recommended by the Presentence Report (PSR).

To raise these challenges, Williams must first overcome the appeal waiver included in his Plea Agreement. We conclude that the appeal waiver does not bar his total-restitution challenge. In this circumstance, the Plea Agreement allows Williams to appeal the apportionment of the total restitution and the substantive reasonableness of his prison sentence as well. Addressing the merits of Williams's challenges, we affirm.

## BACKGROUND

The government charged Williams with a scheme that encompassed four bank-fraud counts, which were based on two loans and an attempted loan from WebBank. Though Williams pleaded guilty to just the first count, in the next section, we review the facts underlying Williams's entire bank-fraud scheme as charged in the Indictment, as memorialized in the Plea Agreement, and as set out without objection in the PSR.

## I.   Factual Background

Williams co-owned and operated his family's vending-machine business, Williams Vending Company, Inc. (WVC). The business sold, leased, operated, and repaired vending machines. Because Williams was a convicted felon and still on parole, he was ineligible to obtain bank loans, which he desired mostly for his personal use. Determined to obtain a loan, he recruited a part-time employee of WVC, described by the

district court as Ms. X, to participate in fraudulently obtaining loans purportedly for WVC. He scripted her role as being the president and sole owner of WVC. In enticing Ms. X into his scheme, Williams knowingly exploited her need for money to feed a crack-cocaine addiction.

Williams's bank-fraud preparations began a year before he first applied for a loan from WebBank. In November 2006, he filed documents with the Colorado Secretary of State that falsely identified Ms. X as WVC's owner. In these filings, he claimed that Ms. X had invested significantly in WVC and managed the company for years. Then in January 2007, he caused Ms. X to fraudulently obtain a $900,000 loan to purchase a residence in Denver, Colorado, at which she neither resided nor intended to reside. And in May 2007, he opened three WVC bank accounts over which Ms. X had "sole signature authority," though Williams in fact controlled the accounts. R. vol. 4 at 268.

With this foundation for the bank-fraud scheme in place, in late 2007, Williams caused Ms. X to fraudulently apply to WebBank for an $800,000 Small Business Administration loan. He had her act as the applicant and personal guarantor for the loan. In addition, he had her falsely claim to be WVC's president and sole owner, to have "years of management experience" at WVC and elsewhere, to earn a substantial salary at WVC, to have "substantial assets," and to reside at the mentioned Denver residence. *Id.* at 269. He also provided various documents to WebBank, signed or purportedly signed by Ms. X. And he further falsely represented that WVC would use the loan funds to fulfill certain government contracts, to pay existing debt, and for working capital. In

support of these representations, he provided a fraudulent vending contract with Peterson Air Force Base and a fraudulent purchase order with Ross Vending.

In December 2007 and January 2008, WebBank approved the loan, issuing eleven checks payable jointly to WVC and a named creditor of WVC. The amount ultimately disbursed was $787,574.58. Though WebBank imposed a condition on the loan that the co-payee creditors sign the checks, none did so. Instead, Williams fraudulently endorsed the checks and deposited them in a WVC bank account without paying any creditors in full as the loan required. He spent the loan proceeds mostly on himself and not for the promised business purposes.

But Williams wanted more. In April 2008, WebBank approved a second loan, this for $300,000, with Ms. X again acting as the applicant and personal guarantor. This time, Williams falsely represented that WVC needed to purchase vending machines and trucks to serve three major apartment complexes. As proof, he provided a fraudulent vending contract with a property-management company and a fraudulent purchase order for vending machines. In May 2008, WebBank wired the loan proceeds to a WVC account. Williams again mostly spent the money on himself, including the purchase of two new Mercedes Benz cars.

Still unsatisfied, a couple of months later, Williams went back to WebBank for more money. In June 2008, WebBank lent another $60,000 on the second loan, for a total amount disbursed of $359,253.70. When applying this time, using Ms. X as before, Williams fraudulently represented that WVC needed to purchase service trucks. In support, he submitted fake invoices from a truck vendor. WebBank issued a check jointly

4

payable to WVC and the vendor. But again, Williams fraudulently endorsed the check and then deposited it in a WVC account he could access. As before, he did not use the loan proceeds for WVC purposes.

And a couple of months later, Williams tried for even more. In August 2008, WebBank denied a last request from him for a third, $550,000 loan (though not because WebBank had yet uncovered the fraud). To support this request, Williams again used Ms. X as before and falsely stated that WVC needed to purchase equipment so that it could qualify to be Denver public schools' exclusive vending-machine servicer. Among the application documents, he provided additional fraudulent documents, seeking to lead WebBank into believing that WVC had reduced its outstanding liabilities.

In January 2009, WebBank discovered the fraud. At this time, the amounts disbursed on the $800,000 and $360,000 loans remained unpaid, meaning that the principal unpaid balances on the loans were $787,574.58 and $359,253.70, respectively. Together, the balances totaled $1,146,828.28.

## II.   Procedural Background

Based on this conduct, the government indicted Williams on four counts of bank fraud under 18 U.S.C. §§ 1344 and 2(b). Williams pleaded guilty to Count One, which related to the $800,000 loan, and the government successfully moved to dismiss the remaining counts. The dismissed counts related to the $300,000 loan, the $60,000 modification to it, and the $550,000 attempted loan. In the Plea Agreement, the parties stipulated to a total amount of restitution of $1,146,828.28 (the unpaid principal on the two loans). In doing so, the parties referenced the operative statute—the

5

Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, which mandates restitution to victims of certain crimes, including bank fraud. *Id.* § 3663A(c)(1)(ii); *see United States v. Bowling*, 619 F.3d 1175, 1187 (10th Cir. 2010) (ruling that the MVRA requires "[a] district court sentencing an individual convicted of bank fraud" to impose restitution).

In the PSR, the probation officer recommended that the court apportion the stipulated restitution of $1,146,828.28 between two listed victims—WebBank for $936,828.28, and Wells Fargo for $210,000. Williams didn't object.[1] The court awarded the total restitution and apportioned it as recommended. In doing so, the court adopted the PSR's extensive fact findings, which included many stipulated facts included in the Plea Agreement.

The PSR explained the reason for recommending the apportionment of $210,000 to Wells Fargo. It noted that in 2011, WebBank had sued Wells Fargo "based on Wells Fargo's negotiation of WebBank's checks despite the fact they bore forged

---

[1] His counsel was attentive and disputed other matters, though, objecting to including the attempted-loan amount of $550,000 as loss in setting the advisory sentencing range under the sentencing guidelines.

endorsements."[2] R. vol. 4 at 272. The PSR noted that "[t]he lawsuit was settled with

Wells Fargo Bank agreeing to pay WebBank $210,000." *Id.* It recommended the parties'

stipulated total-restitution amount of $1,146,828.28, "[p]ursuant to 18 U.S.C. § 3663A."

*Id.* at 296.

At the sentencing hearing, the district court addressed Williams's objections to the

PSR, none of which pertained to restitution. Afterward, the court turned to restitution,

noting that "Mr. Williams is essentially broke, financially unable presently or

prospectively to pay a fine or interest on restitution." R. vol. 8 at 35. Thus, the court

imposed no fine and waived any interest on restitution. The court then adopted the PSR's

recommended total restitution and its apportionment between "the two victims identified

---

[2] If Williams is contesting the Wells Fargo findings as plain error, he must fail.
We acknowledge that in *Davis v. United States*, 140 S. Ct. 1060, 1061–62 (2020) (per
curiam), the Court rejected the Fifth Circuit's rule that plain-error review was
unavailable for unpreserved fact issues. In *United States v. Cristerna-Gonzalez*, 962
F.3d 1253, 1262 (10th Cir. 2020), we noted that *Davis* didn't rule that plain error of
facts can be established by speculation. And we examined *United States v. Saro*, 24
F.3d 283 (D.C. Cir. 1994), a case cited approvingly in *Davis*, in which the D.C.
Circuit ruled that the district court had plainly erred in adopting unobjected-to PSR
facts concerning a defendant's aiding and abetting negotiations in a drug transaction.
*Id.* On this point, we emphasized *Saro*'s language that "at least when those findings
are internally contradictory, wildly implausible, or in direct conflict with the
evidence that the sentencing court heard at trial, factual errors can indeed be
obvious." *Id.* at 1263 (emphasis omitted) (quoting *Saro*, 24 F.3d at 291). That sort of
situation differs from Williams's. Here, the district court acted properly in
"accept[ing] any undisputed portion of the [PSR] as a finding of fact,"
Fed. R. Crim. P. 32(i)(3)(A), and Williams's failure to object permitted the court to
deem the fact admitted without requiring additional evidence from the government,
*United States v. Hooks*, 551 F.3d 1205, 1217 (10th Cir. 2009); *see also United States
v. Dickerson*, 678 F. App'x 706, 723 (10th Cir. 2017) (unpublished) (ruling that "the
law does not require the government to make a showing at the restitution hearing
where the facts underlying the restitution amounts are undisputed").

in the sentencing recommendation[.]"[3] *Id.* Next, the court found that "[a]s a proximate result of Mr. Williams['s] criminal conduct in committing the crime of conviction, WebBank . . . ha[d] suffered pecuniary losses of $936,828.28, and Wells Fargo Bank . . . ha[d] suffered pecuniary losses totaling $210,000, making total restitution of $1,146,828.28."[4] *Id.* Neither party objected or asked for additional findings.

Now, Williams has changed his mind about his restitution stipulation, challenging the restitution order on two grounds. He challenges the total amount, contending that the court had authority to order just $787,574.58 in restitution, the amount then owed on his fraudulent loan charged in his sole count of conviction. He also challenges that the court apportioned the restitution between WebBank and Wells Fargo, arguing that Wells Fargo wasn't a victim to which restitution is permitted. He also now challenges his prison sentence. We review under 28 U.S.C. § 1291.

---

[3] The MVRA has two definitions of victim: one, a "person *directly and proximately* harmed as a result of the commission of an offense" and two, a person "*directly* harmed by a defendant's criminal conduct *in the course of [a] scheme*" from an offense involving scheme as an element. 18 U.S.C. § 3663A(a)(2) (emphasis added).

[4] According to Wells Fargo's Declaration of Victim Losses statement, in the 2011 lawsuit, it paid $210,000 to settle WebBank's 2011 lawsuit alleging that Wells Fargo was responsible for "four checks totaling $531,698.90 deposited into Alan Williams'[s] business checking account . . . between 12/9/07 and 6/17/08." R. vol. 4 at 304. "All four checks had dual payees but were only endorsed by Williams." *Id.* According to WebBank's Declaration of Victim Losses, it suffered $1,058,707.38 in losses from Williams's bank fraud, after offsetting its losses by the $146,176.51 it recovered "by suing Wells Fargo on some forged checks." *Id.* at 305.

## DISCUSSION

In resolving this appeal, we begin by examining whether the appeal waiver bars Williams from appealing the issues he now raises. After determining that it doesn't, we then address the merits of Williams's restitution and prison-sentence arguments. On the merits of his restitution arguments, Williams must surmount the invited-error and plain-error standards, two steep climbs that he cannot summit. On the merits of his argument challenging the substantive reasonableness of his sentence, he hasn't showed that the district court abused its discretion in imposing its 84-month sentence.

## I.     Appeal Waiver

The Plea Agreement in this case contains an appeal waiver, detailed below. But the terms of the appeal waiver and other related Plea Agreement provisions do not bar Williams's appeal of the total-restitution amount; an exception to the waiver saves that argument. Accordingly, the Plea Agreement allows him to appeal other matters that the appeal waiver otherwise would have barred—both the apportionment of restitution and the substantive reasonableness of his prison sentence. That's because the Plea Agreement provides that if an appeal-waiver exception applies, he "may appeal on any ground that is properly available in an appeal that follows a guilty plea." R. vol. 1 at 118. And because we conclude that the appeal waiver doesn't bar Williams's arguments, we decide the merits of Williams's challenges on appeal.

### A.     General Principles Governing Appeal Waivers

Waivers of the right to appeal are generally enforceable. *United States v. Hahn*, 359 F.3d 1315, 1324–25 (10th Cir. 2004) (en banc) (per curiam). In resolving the

enforceability of an appeal waiver, we apply a three-prong inquiry: (1) whether the disputed appeal falls within the scope of the appeal waiver; (2) whether the defendant knowingly and voluntarily waived his appellate rights; and (3) whether enforcing the appeal waiver would result in a miscarriage of justice. *Id.* at 1325 (citation omitted). We decide de novo whether an appeal waiver is enforceable. *United States v. Lonjose*, 663 F.3d 1292, 1297 (10th Cir. 2011) (citation omitted). In evaluating Williams's appeal waiver, we need go no further than the first prong, because his appeal is outside the scope of the waiver.

### B.    Williams's Appeal Waiver

In assessing plea agreements, we construe all the agreement's provisions together. *United States v. Gordon*, 480 F.3d 1205, 1209 (10th Cir. 2007). In negotiating key terms of the Plea Agreement, the parties agreed to the following appeal waiver:

> The defendant is aware that 18 U.S.C. § 3742 affords him the right to appeal his sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets any[5] of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statutes of conviction . . . .[6]

---

[5] The word "any" is handwritten into the Plea Agreement and initialed by counsel. R. vol. 1 at 118.

[6] The other two conditions apply if the court imposes a sentence beyond a defined upper limit (which didn't happen in this case) and if the government appeals (which again didn't happen).

R. vol. 1 at 118.[7]

And in a section entitled "STATUTORY PENALTIES," the Plea Agreement

provides some guidance on the meaning and application of "maximum penalty":

> The maximum statutory penalty for a violation of 18 U.S.C. § 1344 is: not
> more than 360 months of imprisonment; a fine of not more than $1,000,000
> or the greater of twice the gross gain or twice the gross loss from the
> offense, or both a fine and imprisonment; not more than 5 years of
> supervised release; a $100 special assessment fee; plus restitution.

*Id.* at 119. Though the "plus restitution" term by itself doesn't specify a maximum

restitution, the Plea Agreement provides that "[t]he parties agree that the [MVRA]

applies, and that the amount of restitution in this case is $1,146,828.28." *Id.* at 118.

We recognize that restitution presents a less-obvious sort of "maximum" than do

the other categories of penalties. For instance, the statutory maximum prison time of

30 years is self-evident. Determining the maximum restitution requires more work. In

identifying the MVRA's limits in a particular case, a district court must find facts and

then apply them through a multi-layered legal framework. For instance, the amount of

restitution a court may order to most victims is limited to the losses directly and

proximately caused by the defendant's conduct underlying the offense of conviction,

---

[7] Remember, the Plea Agreement provides that if any of the three appeal-waiver exceptions applies, Williams "may appeal on any ground that is properly available in an appeal that follows a guilty plea." R. vol. 1 at 118. Without this provision, the appeal waiver would bar his present appeal of his prison sentence, because his sentence doesn't "exceed[] the maximum sentence within the advisory guideline range that applies to a total offense level of 20[.]" *Id.* And it would bar his apportionment-of-restitution argument because that doesn't relate to a maximum sentence when Williams would otherwise owe the total restitution to WebBank.

though the amount of restitution a court may order to some victims is limited to the losses directly caused by a defendant's conduct in a scheme. *See* 18 U.S.C. § 3663A(a)(2).

But the government drafted the Plea Agreement, including the appeal waiver and associated provisions. And we read any ambiguities in appeal waivers against the government and in favor of a defendant's appellate rights. *Lonjose*, 663 F.3d at 1297 (citations omitted). On appeal, Williams has made a sufficient threshold argument that the total restitution exceeds the MVRA's limit (i.e., what the district court had authority to order paid to WebBank) that he may proceed to the merits. *See Gordon*, 480 F.3d at 1208–10 (reading the plea agreement as a whole in determining that the terms of the appeal waiver didn't waive the defendant's ability to challenge the restitution order as illegal under the MVRA); *cf. United States v. Cooper*, 498 F.3d 1156, 1158–60 (10th Cir. 2007) (enforcing an appeal waiver of the "sentence as imposed by the Court and the manner in which the sentence is determined" against a challenge to restitution). If the government expects us to enforce an appeal waiver in circumstances like these, it needs to write a better appeal waiver. We conclude that Williams's appeal waiver doesn't bar his appeal of the restitution order.

## II.   Restitution Order

### A.   Total-Restitution Amount

Despite clinging to the benefits of the Plea Agreement (Williams emphasizes that he is not seeking to withdraw his favorable plea deal) and acknowledging that he stipulated to total restitution of $1,146,828.28 (the amount owing on his two loans comprising Counts One through Three), Williams now complains that the district court

exceeded its authority under the MVRA by imposing the exact amount of restitution he asked the district court to impose.[8] The invited-error and plain-error doctrines await.

### 1.    Invited Error: Total-Restitution Amount

As mentioned, Williams claims that the district court erred by imposing the total amount of restitution that he stipulated to in the Plea Agreement. He faults the district court, not himself. We, on the other hand, fault Williams, who invited any alleged error. "The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error." *United States v. Johnson*, 183 F.3d 1175, 1178 n.2 (10th Cir. 1999). And more specifically, a defendant cannot invite a district court to impose restitution and later complain that the court was without authority to require any restitution. *Id.* at 1179 (citation omitted) (ruling in a case in which the defendant stipulated to a smaller amount of restitution than the court ordered); *see also United States v. Sukhtipyaroge*, 1 F.4th 603, 606 (8th Cir. 2021) (ruling in a visa-fraud case that by expressly agreeing that a person "was entitled to at least *some* restitution as an 'identifiable victim,' [the defendant] cannot now make the exact opposite

---

[8] In *United States v. Peterson*, 268 F.3d 533, 534 (7th Cir. 2001) (Easterbrook, J.), the court addressed a similar claim from a defendant who on appeal "sings a different tune." After reciting the plea-agreement benefits that the defendant sought to keep while contesting his stipulated restitution, the court observed that "[i]t is not clear that he understands the principal implication of this position: that his plea must be set aside, the four dismissed counts reinstated, and the prosecution resumed in the district court." *Id.* The court noted that it was "not an option" for the defendant to have the benefits of the plea agreement without the detriments. *Id.* In the court's words, "[t]he whole plea agreement stands, or the whole thing fails." *Id.* (citation omitted).

argument on appeal" (citation omitted)); *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005) (ruling that defendant waived any challenge to the restitution amount when he stipulated to that amount in his plea agreement).

By stipulating to the total-restitution amount, Williams did more than not object. With eyes open, he agreed that he owed $1,146,828.28 of restitution—the amount he still owed on his fraudulent bank loans. His stipulation on total restitution led the government to move to dismiss the remaining counts and agree not to charge him further. Yet Williams now complains that $1,146,828.28 in restitution exceeds the $787,574.58 he then owed on his fraudulent loan charged in Count One, his sole count of conviction. But Williams knew that $1,146,828.28 exceeds $787,574.58 when he stipulated to the total-restitution amount.

By stipulating to the total-restitution amount while referencing the MVRA, Williams necessarily agreed that the MVRA supported that amount.[9] And here, as

---

[9] As we understand it, Williams may be trying to short-circuit this conclusion by suggesting that the MVRA *disallows* a defendant from stipulating in a plea agreement to total restitution. In this regard, he contrasts language in the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, stating that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement" with the MVRA's silence on that point. 18 U.S.C. § 3663(a)(3). This misses the mark. The quoted language from subsection (a)(3) simply allows the parties to stipulate to restitution in "*any* criminal case," not just cases involving the crimes specified in subsection (a)(1)(A). Otherwise stated, the "to the extent agreed" phrase modifies "any criminal case," not "restitution." Reading this sentence as Williams does requires treating "any criminal case" as surplusage. *Cf.* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should be ignored."). Further, neither the MVRA nor the VWPA limits total restitution—by allowing parties to stipulate to restitution for nonvictims, both statutes take any cap off restitution. 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3).

explained below, the district court could consider both the MVRA "victim" definitions in accepting and adopting the parties' stipulated total-restitution amount. In that circumstance, Williams is stuck with any error he invited with his stipulation. He cannot escape his invitation by now seeking to undermine its bank-fraud-scheme underpinnings with arguments for extensions or reinterpretations of our circuit law (as discussed later). By leading the district court to impose total restitution of $1,146,828.28, Williams necessarily conceded that his § 1344 bank-fraud scheme justified that amount of restitution under the MVRA. The parties couldn't get to that high a figure without accounting for the losses from the entire scheme. Simply put, Williams invited any alleged error.

### 2.     Plain Error: Total-Restitution Amount

Williams stipulated to the total-restitution amount, so it's no surprise that he didn't object to the district court's imposing it. Even if Williams had not stipulated to the total-restitution amount, he would still lose. Because he didn't object, we would review under the plain-error standard. "To prevail under this standard, [a defendant] must show (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Mendenhall*, 945 F.3d 1264, 1267 (10th Cir. 2019) (internal quotation marks and citation omitted). Williams falters at step two: Regardless of whether the district court erred, Williams fails to establish that any error was plain.

"[I]n the case of an offense that involves as an element a scheme," the MVRA extends restitution to "any person directly harmed by the defendant's criminal

15

conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(2). The Indictment details how Williams "knowingly engage[d] in a scheme to defraud a financial institution, namely, WebBank, and to obtain funds owned by and under the custody and control of it by means of materially false and fraudulent pretenses, representations, and promises, (hereinafter referred to as 'the scheme')." R. vol. 1 at 9. After that, for Count One, the Indictment charges that Williams "did knowingly execute and attempt to execute the scheme described in Paragraphs 1 and 2 of this [I]ndictment by causing WebBank to fund a loan in the amount of $800,000 to [WVC], all in violation of Title 18, United States Code, Sections 1344 and 2(b)." *Id.* at 16.

For the first time on appeal, Williams argues that the district court couldn't lawfully impose restitution based on his bank-fraud scheme.[10] He notes that the bank-fraud statute criminalizes the conduct of a person who "knowingly executes, or attempts to execute, *a scheme or artifice*," 18 U.S.C. § 1344 (emphasis added), not just a "scheme" as required by the MVRA, § 3663A(a)(2). In short, he contends that "scheme

---

[10] The MVRA scheme provision is what enables the total restitution to exceed the amount resulting from Williams's conduct underlying his count of conviction, Count One, relating to the $800,000 loan. That is, the additional restitution is based on the bank-fraud scheme.

That scheme makes it easier for Wells Fargo to also be considered a "victim." The MVRA scheme provision requires merely a showing of direct harm; the other victim definition requires direct and proximate harm. 18 U.S.C. § 3663A(a)(2). But even without relying on the scheme "victim" definition, that is, on the bank-fraud scheme, Wells Fargo could still qualify as a victim, because its losses stemmed from the count of conviction.

or artifice" is broader than the MVRA's condition that the offense "involves as an element a *scheme*, conspiracy, or pattern." He argues that "scheme or artifice" establishes alternative means of violating § 1344, not alternative elements.

Williams bases his argument on *Mathis v. United States*, 136 S. Ct. 2243 (2016), which established the elements-or-means test for categorical-approach analyses. But *Mathis* ruled on the Armed Career Criminal Act's (ACCA), 18 U.S.C. § 924(e), language, which differs from the MVRA's language in text and purpose. *See, e.g.*, *Mathis*, 136 S. Ct. at 2247. The ACCA increases firearm-possession penalties (fines and imprisonment) for defendants with three predicate "serious drug offense[s]" or "violent felon[ies]" or a combination of them. 18 U.S.C. § 924(e)(1). In considering whether a felony is violent, the ACCA asks whether the crime "*has* as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* § 924(e)(2)(B)(i) (emphasis added). In contrast, the MVRA extends restitution liability to an "offense that *involves* as an element a scheme, conspiracy, or pattern of criminal activity." *Id.* § 3663A(a)(2) (emphasis added). Further, though the ACCA bears on criminal penalties, our circuit doesn't treat restitution as a penalty (even though the Plea Agreement in this case defined it as such for appeal-waiver purposes). *See United States v. Serawop*, 505 F.3d 1112, 1122–23 (10th Cir. 2007) (stating that "we have recognized that the MVRA does not inflict criminal punishment, and thus is *not* punitive" (citations and footnote omitted)).

Williams didn't preserve a *Mathis*-type, categorical-approach argument, so we don't review its merits de novo. Instead, as mentioned, Williams must meet the stringent

requirements of plain error. And as the government notes, Williams hasn't cited a case

ruling that *Mathis*'s categorical approach requires a finding that "scheme or artifice"

captures conduct beyond "scheme." Indeed, though pre-*Mathis*, our circuit has said the

opposite about the federal wire-fraud statute's "scheme or artifice" element in relation to

restitution under the MVRA. *See United States v. Gallant*, 537 F.3d 1202, 1248 (10th Cir.

2008) (examining the wire-fraud statute). Moreover, as the government notes, it's an

open question in our circuit whether artifice is something within every scheme. *Cf.

Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("An elaborate artifice of

fraud is the central meaning of a scheme to defraud through false promises.").

Nor have we located a case ruling contrary to *Gallant* on this point. So we can cut

to the simplest way in which Williams fails. Williams cannot meet the second prong of

the plain-error analysis. He hasn't identified any Supreme Court or Tenth Circuit case (or

any case from another circuit) applying the categorical approach to § 1344 bank fraud in

calculating restitution under the MVRA. And we see a good reason why Williams didn't

make this sort of *Mathis* argument in district court—he likely would have jeopardized his

Plea Agreement had he contested the total-restitution amount. Accordingly, Williams

fails in his argument that the district court plainly erred in imposing $1,146,828.28 as

restitution.

## B.   Apportionment Between WebBank and Wells Fargo

For the first time on appeal, Williams challenges the district court's apportioning

$210,000 of the total restitution to Wells Fargo. He correctly notes that the Plea

Agreement doesn't identify by name any entities that qualify as a victim under the

MVRA. But he acknowledges that the PSR recommended apportioning the total restitution between two MVRA victims: WebBank and Wells Fargo. And he concedes that he didn't object to the PSR's recommendation.

Even so, Williams maintains that Wells Fargo is not a victim under the MVRA. He must meet the plain-error standard to prevail on this argument. But he faces an even more difficult challenge than he did on the total-restitution issue. Once he's lost on his total-restitution issue, he can no longer maintain that the total restitution of $1,146,828.28 isn't owed at least to WebBank. As the government puts it, "Williams'[s] substantial rights are undiminished, given that he agreed to restitution of $1.15 million in his Plea Agreement, all of which would have been payable to WebBank if not for its settlement with Wells Fargo." Appellee's Answer Br. at 12. And that leaves him in an untenable spot under a plain-error analysis. Though he faces problems on all four prongs of that analysis, we again cut to the easiest ones on which to affirm—the second and third.

As for the second prong, Williams hasn't cited a case ruling that a defendant can complain about apportionment of an enforceable total amount of restitution. Nor have we located any authority on that point. Accordingly, Williams hasn't shown that his alleged error is plain.

As for the third prong, Williams hasn't shown that the district court's apportionment of his owed restitution substantially prejudiced him. *See United States v. Miller*, 406 F.3d 323, 331–32 (5th Cir. 2005) (ruling that the alleged mistaken award of restitution to the incorrect recipient didn't affect the defendant's substantial rights, "because [the defendant] would be required to pay the same amount of restitution,

regardless of which entity receives it"); *United States v. Brantley*, 537 F.3d 347, 353 (5th Cir. 2008) (ruling that any error in imposing a fine instead of restitution didn't affect the defendant's substantial rights, because the fine was about the same as the restitution the court could have awarded). Every dollar of restitution Williams pays will count in his favor. His total-restitution obligation will neither rise nor fall depending on whether his case involves one victim or two. Any issue from the apportionment would be an issue between Wells Fargo and WebBank, and they have none.

## III.   Prison Sentence

Williams challenges the substantive reasonableness of his 84-month prison sentence. The district court calculated an advisory guideline range of 57–71 months (after reducing the PSR's recommended total offense level from 20 to 18 to comport with Williams's position on the amount of loss). It then varied upward by two levels back to 20, and to an advisory guideline range of 70–87 months, after considering the sentencing factors set out at 18 U.S.C. § 3553(a). Once there, the court imposed an 84-month sentence, an upward variance of thirteen months, or 18 percent.[11]

---

[11] In the district court, Williams sought downward departures and variances. On appeal, he argues against the district court's sentence both as an upward departure and as a variance. We see no confusion in the record. The court "var[ied] upward." R. vol. 8 at 34. It applied the section 3553(a) factors: "Next, I considered carefully the sentencing factors and needs of the federal sentencing statute codified at 18 U.S.C. Section 3553(a)(1) through (7) and made an individualized assessment based on the facts presented." *Id.* at 31. The court mentioned departures only in rejecting Williams's motion for a downward departure.

In its § 3553(a) analysis, the district court noted that Williams's fraud "was a serious offense in the way it was planned and perpetrated, and in the terms of the victims affected and the amount of actual loss to those victims." R. vol. 8 at 32. Further, the court noted Williams's long criminal history, which included fifteen felony convictions for "offenses including robbery, forgery, criminal attempt to commit theft, or burglary, theft, aggravated motor vehicle theft, and identity theft." *Id.* at 33. The court remarked that "[t]his is one of the most extensive criminal records that I've seen on the bench." *Id.*

The district court also addressed Williams's "threat to the public, the need for deterrence, and the need for avoidance of unwarranted sentencing disparities[.]" *Id.* It described Williams as "a career and habitual offender who presents a clear, present, and ongoing threat to the public, especially our financial institutions." *Id.* In considering all the circumstances, the court noted that "[t]roubling here, there are no special or compelling mitigating circumstances." *Id.* Reviewing the failure of past "judicial interventions," the court noted that Williams's "philosophy and lifestyle evince an abject disrespect for our laws and the rights of our citizens." *Id.* at 34. And the court noted "[a]nother troubling and exacerbating, aggravating circumstance," that is, Williams's "continued exploitation of a hapless female drug addict to execute his scheme, and that continued exploitation is unconscionable." *Id.*[12]

---

[12] The PSR advised the court of interviews conducted with Ms. X's sister in which she stated that Ms. X had been addicted to crack cocaine for five years (and during Williams's bank-fraud scheme) so badly that she was emaciated, weighing about 80 pounds. During this time, the sister said, Williams was the only person who would provide Ms. X cash.

The district court's sentence fell within the limits of Williams's appeal waiver. Williams reserved the right to appeal the length of his prison time only if "the sentence exceeds the maximum sentence within the advisory guideline range that applies to a total offense level of 20[.]" R. vol. 1 at 118. It doesn't. But as earlier explained, because Williams can appeal his total-restitution amount, he can appeal his prison sentence too.

We review substantive reasonableness for an abuse of discretion. *See United States v. Smart*, 518 F.3d 800, 805–06 (10th Cir. 2008). In doing so, we ask "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Carter*, 941 F.3d 954, 960–61 (10th Cir. 2019) (internal quotation marks and citation omitted). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (citation omitted).

Williams complains of comments the district court made after explaining and imposing its 84-month sentence. After reviewing Williams's crime and the § 3553(a) factors, the court ruled that a seven-year sentence was proper "to achieve and vindicate the important requirements and needs of the federal sentencing statute." R. vol. 8 at 34. Immediately after that, the district court stated an afterthought: "Additionally, even if only parenthetically, in my long experience[,] a sentence of seven years for a 16th felony conviction where the actual loss approaches $1.5 million is certainly not unreasonable. In the state court system in Colorado, Mr. Williams would easily be approaching habitual criminal territory." *Id.* at 34–35.

Williams contends that the court abused its discretion by treating a loss of $1,114,828.28 as one that "approaches $1.5 million." Opening Br. at 46–48. Whatever "approaches" means, we note that the district court had just reviewed the loss figures and knew what they were. This comment doesn't show the abuse of discretion necessary to warrant a resentencing.

Williams also complains that the district court tied its sentence to Colorado state law. But we see nothing showing that the district court's remark about habitual-offender status under Colorado law impacted his sentence. As mentioned, the district court had already explained and imposed its sentence.

Finally, Williams complains that though his criminal-history category was VI, the court increased his sentence based on his criminal history. But the district court was free to consider Williams's long criminal history and explained its basis for doing so. In short, we see no abuse of discretion.

## CONCLUSION

For the foregoing reasons, we affirm the restitution order and the prison sentence.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                    Jane K. Castro
Clerk of Court                                                           Chief Deputy Clerk

August 23, 2021


Mr. Beale C Tejada
Crane & Tejada
1801 California Street, Suite 2400
Denver, CO 80202


**RE:**     **19-1229, United States v. Williams**
           Dist/Ag docket: 1:15-CR-00395-REB-1

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing
petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Paul Farley
        Elizabeth Ford Milani
        Michael Conrad Johnson

CMW/sds